# STEEL CO., AKA CHICAGO STEEL & PICKLING CO. *v.* CITIZENS FOR A BETTER ENVIRONMENT

No. 96–643.   Argued October 6, 1997—Decided March 4, 1998

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined, and in which BREYER, J., joined as to Parts I and IV. O'CONNOR, J., filed a concurring opinion, in which KENNEDY, J., joined, *post*, p. 110. BREYER, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 111. STEVENS, J., filed an opinion concurring in the judgment, in which SOUTER, J., joined as to Parts I, III, and IV, and GINSBURG, J., joined as to Part III, *post*, p. 112. GINSBURG, J., filed an opinion concurring in the judgment, *post*, p. 134.

*Sanford M. Stein* argued the cause for petitioner. With him on the briefs was *Leo P. Dombrowski.*

*David A. Strauss* argued the cause for respondent. With him on the brief were *James D. Brusslan* and *Stefan A. Noe.*

*Irving L. Gornstein* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Schiffer, Deputy Solicitor General Wallace, James A. Feldman, Edward J. Shawaker,* and *Mark R. Haag.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the American Forest & Paper Association, Inc., et al. by *Jan S. Amundson* and *Quentin Riegel;* for the American Iron & Steel Institute et al. by *Scott M. DuBoff, Valerie J. Ughetta, Robin S. Conrad,* and *J. Walker Henry;* for the Chemical Manufacturers Association by *James W. Conrad, Christina Franz,* and *Carter G. Phillips;* for the Clean Air Implementation Project by *William H. Lewis, Jr.,* and *Michael A. McCord;* for the Mid-America Legal Foundation et al. by *James T. Harrington, William F. Moran III,* and *Gregory*

JUSTICE SCALIA delivered the opinion of the Court.

This is a private enforcement action under the citizen-suit provision of the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA), 100 Stat. 1755, 42 U. S. C. § 11046(a)(1). The case presents the merits question, answered in the affirmative by the United States Court of Appeals for the Seventh Circuit, whether EPCRA authorizes suits for purely past violations. It also presents the jurisdictional question whether respondent, plaintiff below, has standing to bring this action.

I

Respondent, an association of individuals interested in environmental protection, sued petitioner, a small manufacturing company in Chicago, for past violations of EPCRA. EPCRA establishes a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of health-threatening release. Central to its operation are reporting requirements compelling users of specified toxic and hazardous chemicals to file annual

---

R. McClintock; for the Pacific Legal Foundation by Robin L. Rivett and M. Reed Hopper; and for the Washington Legal Foundation by Barry M. Hartman, Daniel J. Popeo, and Paul D. Kamenar.

Briefs of amici curiae urging affirmance were filed for the State of New York et al. by Dennis C. Vacco, Attorney General of New York, Barbara G. Billet, Solicitor General, Peter H. Schiff, Deputy Solicitor General, and Maureen F. Leary, Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: Richard Blumenthal of Connecticut, M. Jane Brady of Delaware, Thurbert E. Baker of Georgia, Calvin E. Holloway, Sr., of Guam, Margery S. Bronster of Hawaii, Pamela Fanning Carter of Indiana, Scott Harshbarger of Massachusetts, Jeremiah W. Nixon of Missouri, Philip T. McLaughlin of New Hampshire, Michael F. Easley of North Carolina, W. A. Drew Edmondson of Oklahoma, William H. Sorrell of Vermont, James S. Gilmore III of Virginia, and Darrell V. McGraw, Jr., of West Virginia; and for the Natural Resources Defense Council, Inc., et al. by James M. Hecker.

"emergency and hazardous chemical inventory forms" and "toxic chemical release forms," which contain, *inter alia*, the name and location of the facility, the name and quantity of the chemical on hand, and, in the case of toxic chemicals, the waste-disposal method employed and the annual quantity released into each environmental medium. 42 U. S. C. §§ 11022 and 11023. The hazardous-chemical inventory forms for any given calendar year are due the following March 1st, and the toxic-chemical release forms the following July 1st. §§ 11022(a)(2) and 11023(a).

Enforcement of EPCRA can take place on many fronts. The Environmental Protection Agency (EPA) has the most powerful enforcement arsenal: it may seek criminal, civil, or administrative penalties. § 11045. State and local governments can also seek civil penalties, as well as injunctive relief. §§ 11046(a)(2) and (c). For purposes of this case, however, the crucial enforcement mechanism is the citizen-suit provision, § 11046(a)(1), which likewise authorizes civil penalties and injunctive relief, see § 11046(c). This provides that "any person may commence a civil action on his own behalf against . . . [a]n owner or operator of a facility for failure," among other things, to "[c]omplete and submit an inventory form under section 11022(a) of this title . . . [and] section 11023(a) of this title." § 11046(a)(1). As a prerequisite to bringing such a suit, the plaintiff must, 60 days prior to filing his complaint, give notice to the Administrator of the EPA, the State in which the alleged violation occurs, and the alleged violator. § 11046(d). The citizen suit may not go forward if the Administrator "has commenced and is diligently pursuing an administrative order or civil action to enforce the requirement concerned or to impose a civil penalty." § 11046(e).

In 1995 respondent sent a notice to petitioner, the Administrator, and the relevant Illinois authorities, alleging—accurately, as it turns out—that petitioner had failed since 1988, the first year of EPCRA's filing deadlines, to complete and

to submit the requisite hazardous-chemical inventory and toxic-chemical release forms under §§ 11022 and 11023. Upon receiving the notice, petitioner filed all of the overdue forms with the relevant agencies. The EPA chose not to bring an action against petitioner, and when the 60-day waiting period expired, respondent filed suit in Federal District Court. Petitioner promptly filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and (6), contending that, because its filings were up to date when the complaint was filed, the court had no jurisdiction to entertain a suit for a present violation; and that, because EPCRA does not allow suit for a purely historical violation, respondent's allegation of untimeliness in filing was not a claim upon which relief could be granted.

The District Court agreed with petitioner on both points. App. to Pet. for Cert. A24–A26. The Court of Appeals reversed, concluding that citizens may seek penalties against EPCRA violators who file after the statutory deadline and after receiving notice. 90 F. 3d 1237 (CA7 1996). We granted certiorari, 519 U. S. 1147 (1997).

II

We granted certiorari in this case to resolve a conflict between the interpretation of EPCRA adopted by the Seventh Circuit and the interpretation previously adopted by the Sixth Circuit in *Atlantic States Legal Foundation, Inc.* v. *United Musical Instruments, U. S. A., Inc.,* 61 F. 3d 473 (1995)—a case relied on by the District Court, and acknowledged by the Seventh Circuit to be "factually indistinguishable," 90 F. 3d, at 1241–1242. Petitioner, however, both in its petition for certiorari and in its briefs on the merits, has raised the issue of respondent's standing to maintain the suit, and hence this Court's jurisdiction to entertain it. Though there is some dispute on this point, see Part III, *infra,* this would normally be considered a threshold question that must be resolved in respondent's favor before proceeding to the

merits. JUSTICE STEVENS' opinion concurring in the judgment, however, claims that the question whether § 11046(a) permits this cause of action is *also* "jurisdictional," and so has equivalent claim to being resolved first. Whether that is so has significant implications for this case and for many others, and so the point warrants extended discussion.

It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i. e.*, the courts' statutory or constitutional *power* to adjudicate the case. See generally 5A C. Wright & A. Miller, Federal Practice and Procedure § 1350, p. 196, n. 8 and cases cited (2d ed. 1990). As we stated in *Bell* v. *Hood*, 327 U. S. 678, 682 (1946), "[j]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." Rather, the district court has jurisdiction if "the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another," *id.*, at 685, unless the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.*, at 682–683; see also *Bray* v. *Alexandria Women's Health Clinic*, 506 U. S. 263, 285 (1993); *The Fair* v. *Kohler Die & Specialty Co.*, 228 U. S. 22, 25 (1913). Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Oneida Indian Nation of N. Y.* v. *County of Oneida*, 414 U. S. 661, 666 (1974); see also *Romero* v. *International Terminal Operating Co.*, 358 U. S. 354, 359 (1959). Here, respondent wins under one construction of EPCRA and loses under another, and JUSTICE STEVENS does not argue that respondent's claim is frivolous or immaterial—

in fact, acknowledges that the language of the citizen-suit provision is ambiguous. *Post*, at 131.

JUSTICE STEVENS relies on our treatment of a similar issue as jurisdictional in *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.*, 484 U. S. 49 (1987). *Post*, at 114. The statute at issue in that case, however, after creating the cause of action, went on to say that "[t]he district courts shall have jurisdiction, *without regard to the amount in controversy or the citizenship of the parties*," to provide various forms of relief. 33 U. S. C. § 1365(a) (emphasis added). The italicized phrase strongly suggested (perhaps misleadingly) that the provision was addressing genuine subject-matter jurisdiction. The corresponding provision in the present case, however, reads as follows:

> "The district court shall have jurisdiction in actions brought under subsection (a) of this section against an owner or operator of a facility to enforce the requirement concerned and to impose any civil penalty provided for violation of that requirement." 42 U. S. C. § 11046(c).

It is unreasonable to read this as making all the elements of the cause of action under subsection (a) jurisdictional, rather than as merely specifying the remedial *powers* of the court, viz., to enforce the violated requirement and to impose civil penalties. "Jurisdiction," it has been observed, "is a word of many, too many, meanings," *United States* v. *Vanness*, 85 F. 3d 661, 663, n. 2 (CADC 1996), and it is commonplace for the term to be used as it evidently was here. See, *e. g.*, 7 U. S. C. § 13a–1(d) ("In any action brought under this section, the Commission may seek and the court shall have jurisdiction to impose . . . a civil penalty in the amount of not more than the higher of $100,000 or triple the monetary gain to the person for each violation"); 15 U. S. C. § 2622(d) ("In actions brought under this subsection, the district courts shall have jurisdiction to grant all appropriate relief,

including injunctive relief and compensatory and exemplary damages"); 42 U. S. C. § 7622(d) ("In actions brought under this subsection, the district courts shall have jurisdiction to grant all appropriate relief including, but not limited to, injunctive relief, compensatory, and exemplary damages").

It is also the case that the *Gwaltney* opinion does not display the slightest awareness that anything *turned upon* whether the existence of a cause of action for past violations was technically jurisdictional—as indeed nothing of substance did. The District Court had statutory jurisdiction over the suit in any event, since continuing violations were also alleged. See 484 U. S., at 64. It is true, as JUSTICE STEVENS points out, that the issue of Article III standing which is addressed at the end of the opinion should technically have been addressed at the outset if the statutory question was not jurisdictional. But that also did not really matter, since Article III standing was in any event found. The short of the matter is that the jurisdictional character of the elements of the cause of action in *Gwaltney* made no substantive difference (nor even any procedural difference that the Court seemed aware of), had been assumed by the parties, and was assumed without discussion by the Court. We have often said that drive-by jurisdictional rulings of this sort (if *Gwaltney* can even be called a ruling on the point rather than a dictum) have no precedential effect. See *Lewis* v. *Casey,* 518 U. S. 343, 352, n. 2 (1996); *Federal Election Comm'n* v. *NRA Political Victory Fund,* 513 U. S. 88, 97 (1994); *United States* v. *L. A. Tucker Truck Lines, Inc.,* 344 U. S. 33, 38 (1952). But even if it is authoritative on the point as to the distinctive statute there at issue, it is fanciful to think that *Gwaltney* revised our established jurisprudence that the failure of a cause of action does not automatically produce a failure of jurisdiction, or adopted the expansive principle that a statute saying "the district court shall have jurisdiction to remedy violations [in specified ways]"

renders the existence of a violation necessary for subject-matter jurisdiction.

JUSTICE STEVENS' concurrence devotes a large portion of its discussion to cases in which a statutory standing question was decided before a question of constitutional standing. See *post*, at 115–117. They also are irrelevant here, because it is not a statutory *standing* question that JUSTICE STEVENS would have us decide first. He wishes to resolve, not whether EPCRA authorizes this plaintiff to sue (it assuredly does), but whether the scope of the EPCRA right of action includes past violations. Such a question, we have held, goes to the merits and not to statutory standing. See *Northwest Airlines, Inc.* v. *County of Kent*, 510 U. S. 355, 365 (1994) ("The question whether a federal statute creates a claim for relief is not jurisdictional"); *Romero* v. *International Terminal Operating Co., supra*, at 359; *Montana-Dakota Util. Co.* v. *Northwestern Public Service Co.*, 341 U. S. 246, 249 (1951).

Though it is replete with extensive case discussions, case citations, rationalizations, and syllogoids, see *post*, at 120, n. 12, and n. 2, *infra*, JUSTICE STEVENS' opinion conspicuously lacks one central feature: a single case in which this Court has done what he proposes, to wit, call the existence of a cause of action "jurisdictional," and decide that question before resolving a dispute concerning the existence of an Article III case or controversy. Of course, even if there were not solid precedent contradicting JUSTICE STEVENS' position, the consequences are alone enough to condemn it. It would turn every statutory question in an EPCRA citizen suit into a question of jurisdiction. Under JUSTICE STEVENS' analysis, § 11046(c)'s grant of "jurisdiction in actions brought *under* [§ 11046(a)]" withholds jurisdiction over claims involving purely past violations if past violations are not in fact *covered* by § 11046(a). By parity of reasoning, if there is a dispute as to whether the omission of a particular item constituted a failure to "complete" the form; or as to

whether a particular manner of delivery complied in time with the requirement to "submit" the form; and if the court agreed with the defendant on the point; the action would not be "brought under [§ 11046(a)]," and would be dismissed for lack of jurisdiction rather than decided on the merits. Moreover, those statutory arguments, since they are "jurisdictional," would have to be considered by this Court even though not raised earlier in the litigation—indeed, this Court would have to raise them *sua sponte*. See *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 278–279 (1977); *Great Southern Fire Proof Hotel Co.* v. *Jones*, 177 U. S. 449, 453 (1900). Congress of course did not create such a strange scheme. In referring to actions "brought under" § 11046(a), § 11046(c) means suits *contending* that § 11046(a) contains a certain requirement. If JUSTICE STEVENS is correct that all cause-of-action questions may be regarded as jurisdictional questions, and thus capable of being decided where there is no genuine case or controversy, it is hard to see what is left of that limitation in Article III.

## III

In addition to its attempt to convert the merits issue in this case into a jurisdictional one, JUSTICE STEVENS' concurrence proceeds, *post*, at 117–124, to argue the bolder point that jurisdiction need not be addressed first anyway. Even if the statutory question is not "fram[ed] . . . in terms of 'jurisdiction,'" but is simply "characterize[d] . . . as whether respondent's complaint states a 'cause of action,'" "it is also clear that we have the power to decide the statutory question first." *Post*, at 117–118. This is essentially the position embraced by several Courts of Appeals, which find it proper to proceed immediately to the merits question, despite jurisdictional objections, at least where (1) the merits question is more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied. See, *e. g., SEC* v. *American*

*Capital Investments, Inc.,* 98 F. 3d 1133, 1139–1142 (CA9 1996), cert. denied *sub nom. Shelton* v. *Barnes,* 520 U. S. 1185 (1997); *Smith* v. *Avino,* 91 F. 3d 105, 108 (CA11 1996); *Clow* v. *Department of Housing and Urban Development,* 948 F. 2d 614, 616, n. 2 (CA9 1991); *Cross-Sound Ferry Services, Inc.* v. *ICC,* 934 F. 2d 327, 333 (CADC 1991); *United States* v. *Parcel of Land,* 928 F. 2d 1, 4 (CA1 1991); *Browning-Ferris Industries* v. *Muszynski,* 899 F. 2d 151, 154–159 (CA2 1990). The Ninth Circuit has denominated this practice—which it characterizes as "assuming" jurisdiction for the purpose of deciding the merits—the "doctrine of hypothetical jurisdiction." See, *e. g., United States* v. *Troescher,* 99 F. 3d 933, 934, n. 1 (1996).[1]

We decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers. This conclusion should come as no surprise, since it is reflected in a long and venerable line of our cases. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle,* 7 Wall. 506, 514 (1869). "On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." *Great Southern Fire Proof Hotel Co.* v. *Jones, supra,* at 453. The requirement that jurisdiction be established as a threshold matter "spring[s] from the nature and limits of

---

[1] Our disposition makes it appropriate to address the approach taken by this substantial body of Court of Appeals precedent. The fact that JUSTICE STEVENS' concurrence takes essentially the same approach makes his contention that this discussion is an "excursion," and "unnecessary to an explanation" of our decision, *post,* at 121, particularly puzzling.

the judicial power of the United States" and is "inflexible and without exception." *Mansfield, C. & L. M. R. Co.* v. *Swan,* 111 U. S. 379, 382 (1884).

This Court's insistence that proper jurisdiction appear begins at least as early as 1804, when we set aside a judgment for the defendant at the instance of the losing plaintiff *who had himself* failed to allege the basis for federal jurisdiction. *Capron* v. *Van Noorden,* 2 Cranch 126 (1804). Just last Term, we restated this principle in the clearest fashion, unanimously setting aside the Ninth Circuit's merits decision in a case that had lost the elements of a justiciable controversy:

> " '[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it. *Mitchell* v. *Maurer,* 293 U. S. 237, 244 (1934). See *Juidice* v. *Vail,* 430 U. S. 327, 331–332 (1977) (standing). 'And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it. [When the lower federal court] lack[s] jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit.' *United States* v. *Corrick,* 298 U. S. 435, 440 (1936) (footnotes omitted).' " *Arizonans for Official English* v. *Arizona,* 520 U. S. 43, 73 (1997), quoting *Bender* v. *Williamsport Area School Dist.,* 475 U. S. 534, 541 (1986) (brackets in original).

JUSTICE STEVENS' arguments contradicting all this jurisprudence—and asserting that a court *may* decide the cause of action before resolving Article III jurisdiction—are readily refuted. First, his concurrence seeks to convert *Bell* v. *Hood,* 327 U. S. 678 (1946), into a case in which the cause-of-action question was decided before an Article III stand-

ing question. *Post*, at 118–119, n. 8. *"Bell,"* JUSTICE STE-VENS asserts, "held that we have jurisdiction to decide [whether the plaintiff has stated a cause of action] *even when it is unclear whether the plaintiff's injuries can be redressed." Post*, at 118. The italicized phrase (the italics are his own) invites the reader to believe that Article III redressability was at issue. Not only is this not true, but the whole *point* of *Bell* was that it is not true. In *Bell*, which was decided before *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), the District Court had dismissed the case on *jurisdictional* grounds because it believed that (what we would now call) a *Bivens* action would not lie. This Court held that the nonexistence of a cause of action was no proper basis for a jurisdictional dismissal. Thus, the uncertainty about "whether the plaintiff's injuries can be redressed" to which JUSTICE STEVENS refers is simply the uncertainty about whether a cause of action existed—which is precisely what *Bell* holds *not* to be an Article III "redressability" question. It would have been a different matter if the relief *requested* by the plaintiffs in *Bell* (money damages) would not have remedied their injury in fact; but it of course would. JUSTICE STEVENS used to understand the fundamental distinction between arguing no cause of action and arguing no Article III redressability, having written for the Court that the former argument is "not squarely directed at jurisdiction itself, but rather at the existence of a remedy for the alleged violation of . . . federal rights," which issue is " 'not of the jurisdictional sort which the Court raises on its own motion.' " *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency*, 440 U. S. 391, 398 (1979) (STEVENS, J.), (quoting *Mt. Healthy Bd. of Ed.* v. *Doyle*, 429 U. S., at 279).

JUSTICE STEVENS also relies on *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers*, 414 U. S. 453 (1974). *Post*, at 119–120. But in that case, we did not determine whether a cause of action existed before de-

termining that the plaintiff had Article III standing; there was no question of injury in fact or effectiveness of the requested remedy. Rather, *National Railroad Passenger Corp.* determined whether a statutory cause of action existed before determining whether (if so) the plaintiff came within the "zone of interests" for which the cause of action was available. 414 U. S., at 465, n. 13. The latter question is an issue of *statutory* standing. It has nothing to do with whether there is case or controversy under Article III. [2]

---

[2] JUSTICE STEVENS thinks it illogical that a merits question can be given priority over a statutory standing question *(National Railroad Passenger Corp.)* and a statutory standing question can be given priority over an Article III question (the cases discussed *post,* at 115–117), but a merits question cannot be given priority over an Article III question. See *post,* at 120, n. 12. It seems to us no more illogical than many other "broken circles" that appear in life and the law: that Executive agreements may displace state law, for example, see *United States* v. *Belmont,* 301 U. S. 324, 330–331 (1937), and that unilateral Presidential action (renunciation) may displace Executive agreements, does not produce the "logical" conclusion that unilateral Presidential action may displace state law. The reasons for allowing merits questions to be decided before statutory standing questions do not support allowing merits questions to be decided before Article III questions. As *National Railroad Passenger Corp.* points out, the merits inquiry and the statutory standing inquiry often "overlap," 414 U. S., at 456. The question whether *this* plaintiff has a cause of action under the statute, and the question whether *any* plaintiff has a cause of action under the statute are closely connected—indeed, depending upon the asserted basis for lack of statutory standing, they are sometimes identical, so that it would be exceedingly artificial to draw a distinction between the two. The same cannot be said of the Article III requirement of remediable injury in fact, which (except with regard to entirely frivolous claims) has nothing to do with the text of the statute relied upon. Moreover, deciding whether any cause of action exists under a particular statute, rather than whether the particular plaintiff can sue, does not take the court into vast, uncharted realms of judicial opinion giving; whereas the proposition that the court can reach a merits question when there is no Article III jurisdiction opens the door to all sorts of "generalized grievances," *Schlesinger* v. *Reservists Comm. to Stop the War,* 418 U. S. 208, 217 (1974), that the Constitution leaves for resolution through the political process.

Much more extensive defenses of the practice of deciding the cause of action before resolving Article III jurisdiction have been offered by the Courts of Appeals. They rely principally upon two cases of ours, *Norton* v. *Mathews*, 427 U. S. 524 (1976), and *Secretary of Navy* v. *Avrech*, 418 U. S. 676 (1974) *(per curiam)*. Both are readily explained, we think, by their extraordinary procedural postures. In *Norton*, the case came to us on direct appeal from a three-judge District Court, and the jurisdictional question was whether the action was properly brought in that forum rather than in an ordinary district court. We declined to decide that jurisdictional question, because the merits question was decided *in a companion case, Mathews* v. *Lucas*, 427 U. S. 495 (1976), with the consequence that the jurisdictional question could have no effect on the outcome: If the three-judge court had been properly convened, we would have affirmed, and if not, we would have vacated and remanded for a fresh decree from which an appeal could be taken to the Court of Appeals, the outcome of which was foreordained by *Lucas*. *Norton* v. *Mathews, supra,* at 531. Thus, *Norton* did not use the pretermission of the jurisdictional question as a device for reaching a question of law that otherwise would have gone unaddressed. Moreover, the Court seems to have regarded the merits judgment that it entered on the basis of *Lucas* as equivalent to a jurisdictional dismissal for failure to present a substantial federal question. The Court said: "This disposition *[Lucas]* renders the merits in the present case a decided issue and thus one no longer substantial in the jurisdictional sense." 427 U. S., at 530–531. We think it clear that this peculiar case, involving a merits issue dispositively resolved in a companion case, was not meant to overrule, *sub silentio*, two centuries of jurisprudence affirming the necessity of determining jurisdiction before proceeding to the merits. See *Clow*, 948 F. 2d, at 627 (O'Scannlain, J., dissenting).

*Avrech* also involved an instance in which an intervening Supreme Court decision definitively answered the merits

question. The jurisdictional question in the case had been raised by the Court *sua sponte* after oral argument, and supplemental briefing had been ordered. *Secretary of Navy* v. *Avrech, supra,* at 677. Before the Court came to a decision, however, the merits issue in the case had been conclusively resolved in *Parker* v. *Levy,* 417 U. S. 733 (1974), a case argued the same day as *Avrech.* The Court was unwilling to decide the jurisdictional question without oral argument, 418 U. S., at 677, but acknowledged (with some understatement) that "even the most diligent and zealous advocate could find his ardor somewhat dampened in arguing a jurisdictional issue where the decision on the merits is . . . foreordained," *id.,* at 678. Accordingly, the Court disposed of the case on the basis of the intervening decision in *Parker,* in a minimalist two-page *per curiam* opinion. The first thing to be observed about *Avrech* is that the supposed jurisdictional issue was technically not that. The issue was whether a court-martial judgment could be attacked collaterally by a suit for backpay. Although *Avrech,* like the earlier case of *United States* v. *Augenblick,* 393 U. S. 348 (1969), characterized this question as jurisdictional, we later held squarely that it was not. See *Schlesinger* v. *Councilman,* 420 U. S. 738, 753 (1975). In any event, the peculiar circumstances of *Avrech* hardly permit it to be cited for the precedent-shattering general proposition that an "easy" merits question may be decided *on the assumption* of jurisdiction. To the contrary, the fact that the Court ordered briefing on the jurisdictional question *sua sponte* demonstrates its adherence to traditional and constitutionally dictated requirements. See *Cross-Sound Ferry Services, Inc.* v. *ICC,* 934 F. 2d, at 344–345, and n. 10 (Thomas, J., concurring in part and concurring in denial of petition for review).

Other cases sometimes cited by the lower courts to support "hypothetical jurisdiction" are similarly distinguishable. *United States* v. *Augenblick,* as we have discussed, did not involve a jurisdictional issue. In *Philbrook* v. *Glodgett,* 421 U. S. 707, 721 (1975), the jurisdictional question was whether,

in a suit under 28 U. S. C. § 1343(3) against the Commissioner of the Vermont Department of Social Welfare for deprivation of federal rights under color of state law by denying payments under a federally funded welfare program, the plaintiff could join a similar claim against the Secretary of Health, Education, and Welfare. The merits issue of statutory construction involved in the claim against the Secretary was precisely the same as that involved in the claim against the Commissioner, and the Secretary (while challenging jurisdiction) assured the Court that he would comply with any judgment entered against the Commissioner. The Court's disposition of the case was to dismiss the Secretary's appeal under what was then this Court's Rule 40(g), for failure to brief the jurisdictional question adequately. Normally, the Court acknowledged, its obligation to inquire into the jurisdiction of the District Court might prevent this disposition. But here, the Court concluded, "the substantive issue decided by the District Court would have been decided by that court even if it had concluded that the Secretary was not properly a party," and "the only practical difference that resulted . . . was that its injunction was directed against him as well as against [the Commissioner]," which the Secretary "has [not] properly contended to be wrongful before this Court." 421 U. S., at 721–722. And finally, in *Chandler* v. *Judicial Council of Tenth Circuit*, 398 U. S. 74 (1970), we reserved the question whether we had jurisdiction to issue a writ of prohibition or mandamus because the petitioner had not exhausted all available avenues before seeking relief under the All Writs Act, 28 U. S. C. § 1651, and because there was no record to review. 398 U. S., at 86–88. The exhaustion question *itself* was at least arguably jurisdictional, and was clearly treated as such. *Id.*, at 86.[3]

---

[3] JUSTICE STEVENS adds three cases to the list of those that might support "hypothetical jurisdiction." *Post*, at 121–122, and n. 15. They are all inapposite. In *Moor* v. *County of Alameda*, 411 U. S. 693 (1973), we declined to decide whether a federal court's pendent jurisdiction extended

While some of the above cases must be acknowledged to have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question, none of them even approaches approval of a doctrine of "hypothetical jurisdiction" that enables a court to resolve contested questions of law when its jurisdiction is in doubt. Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning. *Muskrat* v. *United States*, 219 U. S. 346, 362 (1911); *Hayburn's Case*, 2 Dall. 409 (1792). Much more than legal niceties are at stake here. The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects. See *United States* v. *Richardson*, 418 U. S. 166, 179 (1974); *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208, 227 (1974). For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no ju-

---

to state-law claims against a new party, because we agreed with the District Court's discretionary declination of pendent jurisdiction. *Id.*, at 715–716. Thus, the case decided not a merits question before a jurisdictional question, but a discretionary jurisdictional question before a nondiscretionary jurisdictional question. Similarly in *Ellis* v. *Dyson*, 421 U. S. 426, 436 (1975), the "authoritative ground of decision" upon which the District Court relied in lieu of determining whether there was a case or controversy was *Younger* abstention, which we have treated as jurisdictional. And finally, the issue pretermitted in *Neese* v. *Southern R. Co.*, 350 U. S. 77 (1955) *(per curiam)*, was not Article III jurisdiction at all, but the substantive question whether the Seventh Amendment permits an appellate court to review the district court's denial of a motion for new trial on the ground that the verdict was excessive. We declined to consider that question because we agreed with the District Court's decision to deny the motion on the facts in the record. The more numerous the look-alike-but-inapposite cases JUSTICE STEVENS cites, the more strikingly clear it becomes: His concurrence cannot identify a single opinion of ours deciding the merits before a disputed question of Article III jurisdiction.

risdiction to do so is, by very definition, for a court to act ultra vires.

## IV

Having reached the end of what seems like a long front walk, we finally arrive at the threshold jurisdictional question: whether respondent, the plaintiff below, has standing to sue. Article III, § 2, of the Constitution extends the "judicial Power" of the United States only to "Cases" and "Controversies." We have always taken this to mean cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process. *Muskrat* v. *United States, supra,* at 356–357. Such a meaning is fairly implied by the text, since otherwise the purported restriction upon the judicial power would scarcely be a restriction at all. Every criminal investigation conducted by the Executive is a "case," and every policy issue resolved by congressional legislation involves a "controversy." These are not, however, the sort of cases and controversies that Article III, § 2, refers to, since "the Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts." *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 559–560 (1992). Standing to sue is part of the common understanding of what it takes to make a justiciable case. *Whitmore* v. *Arkansas,* 495 U. S. 149, 155 (1990).[4]

The "irreducible constitutional minimum of standing" contains three requirements. *Lujan* v. *Defenders of Wildlife,*

---

[4] Our opinion is not motivated, as JUSTICE STEVENS suggests, by the more specific separation-of-powers concern that this citizen's suit "somehow interferes with the Executive's power to 'take Care that the Laws be faithfully executed,' Art. II, § 3," *post,* at 129. The courts must stay within their constitutionally prescribed sphere of action, whether or not exceeding that sphere will harm one of the other two branches. This case calls for nothing more than a straightforward application of our standing jurisprudence, which, though it may sometimes have an impact on Presidential powers, derives from Article III and not Article II.

*supra,* at 560. First and foremost, there must be alleged (and ultimately proved) an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.' " *Whitmore* v. *Arkansas, supra,* at 149, 155 (quoting *Los Angeles* v. *Lyons,* 461 U. S. 95, 101–102 (1983)). Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. *Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26, 41–42 (1976). And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury. *Id.,* at 45–46; see also *Warth* v. *Seldin,* 422 U. S. 490, 505 (1975). This triad of injury in fact, causation, and redressability[5] constitutes the core of Article III's case-or-

---

[5] Contrary to JUSTICE STEVENS' belief that redressability "is a judicial creation of the past 25 years," *post,* at 124, the concept has been ingrained in our jurisprudence from the beginning. Although we have packaged the requirements of constitutional "case" or "controversy" somewhat differently in the past 25 years—an era rich in three-part tests—the point has always been the same: whether a plaintiff "personally would benefit in a tangible way from the court's intervention." *Warth,* 422 U. S., at 508. For example, in *Marye* v. *Parsons,* 114 U. S. 325, 328–329 (1885), we held that a bill in equity should have been dismissed because it was a clear case of *"damnum absque injuriâ."* Although the complainant alleged a breach of contract by the State, the complainant "asks no relief as to that, for there is no remedy by suit to compel the State to pay its debts. . . . The bill as framed, therefore, calls for a declaration of an abstract character." Because courts do not "si[t] to determine questions of law *in thesi,*" we remanded with directions to dismiss the bill. *Id.,* at 328–330.

Also contrary to JUSTICE STEVENS' unprecedented suggestion, *post,* at 125, redressability—like the other prongs of the standing inquiry—does not depend on the defendant's status as a governmental entity. There is no conceivable reason why it should. If it is true, as JUSTICE STEVENS claims, that all of the cases in which the Court has denied standing because of a lack of redressability happened to involve government action or inaction, that would be unsurprising. Suits that promise no concrete benefit to the plaintiff, and that are brought to have us "determine questions of law *in thesi,*" *Marye, supra,* at 330, are most often inspired by the psychological smart of perceived official injustice, or by the government-policy

controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence. See *FW/PBS, Inc.* v. *Dallas,* 493 U. S. 215, 231 (1990).

We turn now to the particulars of respondent's complaint to see how it measures up to Article III's requirements. This case is on appeal from a Rule 12(b) motion to dismiss on the pleadings, so we must presume that the general allegations in the complaint encompass the specific facts necessary to support those allegations. *Lujan* v. *National Wildlife Federation,* 497 U. S. 871, 889 (1990). The complaint contains claims "on behalf of both [respondent] itself and its members."[6] App. 4. It describes respondent as an organization that seeks, uses, and acquires data reported under EPCRA. It says that respondent "reports to its members and the public about storage and releases of toxic chemicals into the environment, advocates changes in environmental regulations and statutes, prepares reports for its members and the public, seeks the reduction of toxic chemicals and further seeks to promote the effective enforcement of environmental laws." *Id.,* at 5. The complaint asserts that respondent's "right to know about [toxic-chemical] releases and its interests in protecting and improving the environment and the health of its members have been, are being, and will be adversely affected by [petitioner's] actions in failing to provide timely and required information under EPCRA." *Ibid.* The complaint also alleges that respondent's members, who live in or frequent the area near petitioner's facility, use the EPCRA-reported information "to learn about

preferences of political activists. But the principle of redressability has broader application than that.

[6] EPCRA states that "any person may commence a civil action *on his own behalf* . . . ." 42 U. S. C. § 11046(a)(1) (emphasis added). "[P]erson" includes an association, see § 11049(7), so it is arguable that the statute permits respondent to vindicate only its own interests as an organization, and not the interests of its individual members. Since it makes no difference to our disposition of the case, we assume without deciding that the interests of individual members may be the basis of suit.

toxic chemical releases, the use of hazardous substances in their communities, to plan emergency preparedness in the event of accidents, and to attempt to reduce the toxic chemicals in areas in which they live, work and visit." *Ibid.* The members' "safety, health, recreational, economic, aesthetic and environmental interests" in the information, it is claimed, "have been, are being, and will be adversely affected by [petitioner's] actions in failing to file timely and required reports under EPCRA." *Ibid.*

As appears from the above, respondent asserts petitioner's failure to provide EPCRA information in a timely fashion, and the lingering effects of that failure, as the injury in fact to itself and its members. We have not had occasion to decide whether being deprived of information that is supposed to be disclosed under EPCRA—or at least being deprived of it when one has a particular plan for its use—is a concrete injury in fact that satisfies Article III. Cf. *Lujan* v. *Defenders of Wildlife,* 504 U. S., at 578. And we need not reach that question in the present case because, assuming injury in fact, the complaint fails the third test of standing, redressability.

The complaint asks for (1) a declaratory judgment that petitioner violated EPCRA; (2) authorization to inspect periodically petitioner's facility and records (with costs borne by petitioner); (3) an order requiring petitioner to provide respondent copies of all compliance reports submitted to the EPA; (4) an order requiring petitioner to pay civil penalties of $25,000 per day for each violation of §§ 11022 and 11023; (5) an award of all respondent's "costs, in connection with the investigation and prosecution of this matter, including reasonable attorney and expert witness fees, as authorized by Section 326(f) of [EPCRA]"; and (6) any such further relief as the court deems appropriate. App. 11. None of the specific items of relief sought, and none that we can envision as "appropriate" under the general request, would serve to reimburse respondent for losses caused by the late re-

porting, or to eliminate any effects of that late reporting upon respondent.[7]

The first item, the request for a declaratory judgment that petitioner violated EPCRA, can be disposed of summarily. There being no controversy over whether petitioner failed to file reports, or over whether such a failure constitutes a violation, the declaratory judgment is not only worthless to respondent, it is seemingly worthless to all the world. See *Lewis* v. *Continental Bank Corp.*, 494 U. S. 472, 479 (1990).

Item (4), the civil penalties authorized by the statute, see § 11045(c), might be viewed as a sort of compensation or redress to respondent if they were payable to respondent. But they are not. These penalties—the only damages authorized by EPCRA—are payable to the United States Treasury. In requesting them, therefore, respondent seeks not remediation of its own injury—reimbursement for the costs it incurred as a result of the late filing—but vindication of the rule of law—the "undifferentiated public interest" in faithful execution of EPCRA. *Lujan* v. *Defenders of Wildlife, supra,* at 577; see also *Fairchild* v. *Hughes,* 258 U. S. 126, 129–130 (1922). This does not suffice. JUSTICE STEVENS thinks it is enough that respondent will be gratified by seeing petitioner punished for its infractions and that the

---

[7] JUSTICE STEVENS claims that redressability was found lacking in our prior cases because the relief required action by a party not before the Court. *Post,* at 125–126. Even if that were so, it would not prove that redressability is lacking *only* when relief depends on the actions of a third party. But in any event, JUSTICE STEVENS has overlooked decisions that destroy his premise. See *Los Angeles* v. *Lyons,* 461 U. S. 95, 105 (1983); *O'Shea* v. *Littleton,* 414 U. S. 488, 495–496 (1974). He also seems to suggest that redressability always exists when the defendant has directly injured the plaintiff. If that were so, the redressability requirement would be entirely superfluous, since the causation requirement asks whether the injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] resul[t] [of] the independent action of some third party not before the court." *Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26, 41–42 (1976).

punishment will deter the risk of future harm. *Post*, at 127–128. If that were so, our holdings in *Linda R. S.* v. *Richard D.*, 410 U. S. 614 (1973), and *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26 (1976), are inexplicable. Obviously, such a principle would make the redressability requirement vanish. By the mere bringing of his suit, *every* plaintiff demonstrates his belief that a favorable judgment will make him happier. But although a suitor may derive great comfort and joy from the fact that the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury. See, *e. g., Allen* v. *Wright*, 468 U. S. 737, 754–755 (1984); *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 482–483 (1982). Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.

Item (5), the "investigation and prosecution" costs "as authorized by Section 326(f)," would assuredly benefit respondent as opposed to the citizenry at large. Obviously, however, a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself. An "interest in attorney's fees is . . . insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis* v. *Continental Bank Corp., supra*, at 480 (citing *Diamond* v. *Charles*, 476 U. S. 54, 70–71 (1986)). Respondent asserts that the "investigation costs" it seeks were incurred prior to the litigation, in digging up the emissions and storage information that petitioner should have filed, and that respondent needed for its own purposes. See Brief for Respondent 37–38. The recovery of such expenses unrelated

to litigation would assuredly support Article III standing, but the problem is that § 326(f), which is the entitlement to monetary relief that the complaint invokes, covers only the "costs of litigation." [8]    § 11046(f).    Respondent finds itself, in other words, impaled upon the horns of a dilemma: For the expenses to be reimbursable under the statute, they must be costs of litigation; but reimbursement of the costs of litigation cannot alone support standing. [9]

The remaining relief respondent seeks (item (2), giving respondent authority to inspect petitioner's facility and records, and item (3), compelling petitioner to provide respondent copies of EPA compliance reports) is injunctive in nature. It cannot conceivably remedy any past wrong but is aimed at deterring petitioner from violating EPCRA in the future. See Brief for Respondent 36.    The latter objective can of course be "remedial" for Article III purposes, when threatened injury is one of the gravamens of the complaint.    If respondent had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy that alleged harm.    But there is no such allegation here—and on the facts of the case, there seems no basis for it.    Nothing supports the requested injunctive relief except respondent's generalized interest in deterrence,

---

[8] Section 326(f) reads: "The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or the substantially prevailing party whenever the court determines such an award is appropriate."    42 U. S. C. § 11046(f).

[9] JUSTICE STEVENS contends, post, at 123–124, n. 16, that this argument involves us in a construction of the statute, and thus belies our insistence that jurisdictional issues be resolved first.    It involves us in a construction of the statute only to the extent of rejecting as frivolous the contention that costs incurred for respondent's own purposes, not in preparation for litigation (and hence sufficient to support Article III standing), are nonetheless "costs of litigation" under the statute.    As we have described earlier, our cases make clear that frivolous claims are themselves a jurisdictional defect.    See supra, at 89.

which is insufficient for purposes of Article III. See *Los Angeles* v. *Lyons*, 461 U. S., at 111.

The United States, as *amicus curiae*, argues that the injunctive relief does constitute remediation because "there is a presumption of [future] injury when the defendant has voluntarily ceased its illegal activity in response to litigation," even if that occurs before a complaint is filed. Brief for United States as *Amicus Curiae* 27–28, and n. 11. This makes a sword out of a shield. The "presumption" the Government refers to has been applied to refute the assertion of mootness by a defendant who, when sued in a complaint that alleges present or threatened injury, ceases the complained-of activity. See, *e. g.*, *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 632 (1953). It is an immense and unacceptable stretch to call the presumption into service as a substitute for the allegation of present or threatened injury upon which initial standing must be based. See *Los Angeles* v. *Lyons*, *supra*, at 109. To accept the Government's view would be to overrule our clear precedent requiring that the allegations of future injury be particular and concrete. *O'Shea* v. *Littleton*, 414 U. S. 488, 496–497 (1974). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.*, at 495–496; see also *Renne* v. *Geary*, 501 U. S. 312, 320 (1991) ("[T]he mootness exception for disputes capable of repetition yet evading review . . . will not revive a dispute which became moot before the action commenced"). Because respondent alleges only past infractions of EPCRA, and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury.

\* \* \*

Having found that none of the relief sought by respondent would likely remedy its alleged injury in fact, we must conclude that respondent lacks standing to maintain this suit,

and that we and the lower courts lack jurisdiction to entertain it. However desirable prompt resolution of the merits EPCRA question may be, it is not as important as observing the constitutional limits set upon courts in our system of separated powers. EPCRA will have to await another day.

The judgment is vacated, and the case is remanded with instructions to direct that the complaint be dismissed.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE KENNEDY joins, concurring.

I join the Court's opinion. I agree that our precedent supports the Court's holding that respondent lacks Article III standing because its injuries cannot be redressed by a judgment that would, in effect, require only the payment of penalties to the United States Treasury. As the Court notes, *ante*, at 108, had respondent alleged a continuing or imminent violation of the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA), 42 U. S. C. § 11046, the requested injunctive relief may well have redressed the asserted injury.

I also agree with the Court's statement that federal courts should be certain of their jurisdiction before reaching the merits of a case. As the Court acknowledges, however, several of our decisions "have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question." *Ante*, at 101. The opinion of the Court adequately describes why the assumption of jurisdiction was defensible in those cases, see *ante*, at 98–100, and why it is not in this case, see *ante*, at 92–93. I write separately to note that, in my view, the Court's opinion should not be read as cataloging an exhaustive list of circumstances under which federal courts may exercise judgment in "reserv[ing] difficult questions of . . . jurisdiction when the case alternatively

could be resolved on the merits in favor of the same party,"
*Norton* v. *Mathews,* 427 U. S. 524, 532 (1976).

JUSTICE BREYER, concurring in part and concurring in
the judgment.

I agree with the Court that the respondent in this case
lacks Article III standing. I further agree that federal
courts often, and typically should, decide standing questions
at the outset of a case. That order of decision (first jurisdic-
tion then the merits) helps better to restrict the use of the
federal courts to those adversarial disputes that Article III
defines as the federal judiciary's business. But my qualify-
ing words "often" and "typically" are important. The Con-
stitution, in my view, does not require us to replace those
words with the word "always." The Constitution does not
impose a rigid judicial "order of operations," when doing so
would cause serious practical problems.

This Court has previously made clear that courts may "re-
serv[e] difficult questions of . . . jurisdiction when the case
alternatively could be resolved on the merits in favor of the
same party." *Norton* v. *Mathews,* 427 U. S. 524, 532 (1976).
That rule makes theoretical sense, for the difficulty of the
jurisdictional question makes reasonable the court's juris-
dictional assumption. And that rule makes enormous prac-
tical sense. Whom does it help to have appellate judges
spend their time and energy puzzling over the correct an-
swer to an intractable jurisdictional matter, when (assum-
ing an easy answer on the substantive merits) the same
party would win or lose regardless? More importantly, to
insist upon a rigid "order of operations" in today's world of
federal-court caseloads that have grown enormously over a
generation means unnecessary delay and consequent added
cost. See L. Mecham, Judicial Business of the United States
Courts: 1996 Report of the Director 16, 18, 23; Report of the
Proceedings of the Judicial Conference of the United States

106, 115, 143 (1971) (indicating that between 1971 and 1996, annual appellate court caseloads increased from 132 to 311 cases filed per judgeship, and district court caseloads increased from 341 to 490 cases filed per judgeship). It means a more cumbersome system. It thereby increases, to at least a small degree, the risk of the "justice delayed" that means "justice denied."

For this reason, I would not make the ordinary sequence an absolute requirement. Nor, even though the case before us is ordinary, not exceptional, would I simply reserve judgment about the matter. *Ante,* at 110–111 (O'CONNOR, J., concurring). I therefore join only Parts I and IV of the Court's opinion.

JUSTICE STEVENS, with whom JUSTICE SOUTER joins as to Parts I, III, and IV, and with whom JUSTICE GINSBURG joins as to Part III, concurring in the judgment.

This case presents two questions: (1) whether the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA), 42 U. S. C. § 11001 *et seq.,* confers federal jurisdiction over citizen suits for wholly past violations; and (2) if so, whether respondent has standing under Article III of the Constitution. The Court has elected to decide the constitutional question first and, in doing so, has created new constitutional law. Because it is always prudent to avoid passing unnecessarily on an undecided constitutional question, see *Ashwander* v. *TVA,* 297 U. S. 288, 345–348 (1936) (Brandeis, J., concurring), the Court should answer the statutory question first. Moreover, because EPCRA, properly construed, does not confer jurisdiction over citizen suits for wholly past violations, the Court should leave the constitutional question for another day.

I

The statutory issue in this case can be viewed in one of two ways: whether EPCRA confers "jurisdiction" over citizen suits for wholly past violations, or whether the statute

creates such a "cause of action." Under either analysis, the Court has the power to answer the statutory question first.

EPCRA frames the question in terms of "jurisdiction." Section 326(c) states:

> "The district court shall have jurisdiction in actions brought under [§ 326(a)] against an owner or operator of a facility to enforce the requirement concerned and to impose any civil penalty provided for violation of that requirement." 42 U. S. C. § 11046(c).

Thus, if § 326(a) authorizes citizen suits for wholly past violations, the district court has jurisdiction over these actions; if it does not, the court lacks jurisdiction.

Given the text of the statute, it is not surprising that the parties and the District Court framed the question in jurisdictional terms. Respondent's complaint alleged that the District Court had "subject matter jurisdiction under Section 326(a) of EPCRA, 42 U. S. C. § 11046(a)." App. 3. The merits questions that were raised by respondent's complaint were whether Steel Company violated EPCRA and, if so, what relief should be granted. The District Court, however, made no ruling on the merits when it granted Steel Company's motion to dismiss. It held that dismissal was required because respondent had merely alleged "a failure to timely file the required reports, a violation of the Act for which there is no jurisdiction for a citizen suit." App. to Pet. for Cert. A26.[1] Steel Company has also framed the

---

[1] See also *Don't Waste Arizona, Inc.* v. *McLane Foods, Inc.*, 950 F. Supp. 972, 977–978 (Ariz. 1997) ("[T]his Court has jurisdiction to hear this citizen suit brought pursuant to 42 U. S. C. § 11046(a) for a wholly past violation of the EPCRA"); *Delaware Valley Toxics Coalition* v. *Kurz-Hastings*, 813 F. Supp. 1132, 1141 (ED Pa. 1993) ("This court concludes that 42 U. S. C. § 11046(a)(1) does provide the federal courts with jurisdiction for wholly past violations of the EPCRA"); *Atlantic States Legal Foundation* v. *Whiting Roll-Up Door Manufacturing Corp.*, 772 F. Supp. 745, 750 (WDNY 1991) ("The plain language of EPCRA's reporting, enforcement and civil penalty provisions, when logically viewed together, compel a con-

question as a jurisdictional one in its briefs before this Court.[2]

The threshold issue concerning the meaning of § 326 is virtually identical to the question that we decided in *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.*, 484 U. S. 49 (1987). In that case, we considered whether § 505(a) of the Clean Water Act allows suits for wholly past violations.[3] We unanimously characterized that question as a matter of "jurisdiction":

> "In this case, we must decide whether § 505(a) of the Clean Water Act, also known as the Federal Water Pollution Control Act, 33 U. S. C. § 1365(a), confers federal jurisdiction over citizen suits for wholly past violations." *Id.*, at 52.

See also *Block* v. *Community Nutrition Institute*, 467 U. S. 340, 353, n. 4 (1984) (citing *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers*, 414 U. S. 453, 456, 465, n. 13 (1974)). If we resolve the comparable statutory issue in the same way in this case, federal courts will have no jurisdiction to address the merits in future similar cases. Thus, this is not a case in which the choice between resolving the statutory question or the standing question first is a choice between a merits issue and a juris-

---

clusion that EPCRA confers federal jurisdiction over citizen lawsuits for past violations").

[2] Brief for Petitioner 12 ("A statute conferring jurisdiction on the federal courts should . . . be strictly construed, and any doubts resolved against jurisdiction. Here there are serious doubts that Congress intended citizens to sue for past EPCRA violations, and all citizen plaintiffs can highlight is a slight difference in language and attempt to stretch that difference into federal jurisdiction"); see also *id.*, at 26, 30.

[3] Gwaltney contended that "because its last recorded violation occurred several weeks before respondents filed their complaint, the District Court lacked subject-matter jurisdiction over respondents' action." *Gwaltney*, 484 U. S., at 55.

dictional issue; rather, it is a choice between two jurisdictional issues.

We have routinely held that when presented with two jurisdictional questions, the Court may choose which one to answer first. In *Sierra Club* v. *Morton*, 405 U. S. 727 (1972), for example, we were presented with a choice between a statutory jurisdictional question and a question of Article III standing. In that case, the United States, as respondent, argued that petitioner lacked standing under the Administrative Procedure Act and under the Constitution.[4] Rather than taking up the constitutional issue, the Court stated:

> "Where . . . Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, *the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff."* *Id.*, at 732 (emphasis added).

The Court concluded that petitioner lacked standing under the statute, *id.*, at 732–741, and, therefore, did not need to

---

[4] 405 U. S., at 753–755 (App. to opinion of Douglas, J., dissenting) (Extract from Oral Argument of the Solicitor General); Brief for Respondent in *Sierra Club* v. *Morton*, O. T. 1970, No. 70–34, p. 18 ("The irreducible minimum requirement of standing reflects the constitutional limitation of judicial power to 'Cases' and 'Controversies'—'whether the party invoking federal court jurisdiction has "a personal stake in the outcome of the controversy" . . . and whether the dispute touches upon the "legal relations of parties having adverse legal interests."' *Flast* v. *Cohen*, 392 U. S. 83, 101 [(1968)]"); see also Brief for County of Tulare as *Amicus Curiae* in *Sierra Club* v. *Morton*, O. T. 1970, No. 70–34, pp. 13–14 ("This Court long ago held that to have standing . . . a party must show he has sustained or is immediately in danger of sustaining some direct injury . . . and not merely that he suffers in some indefinite way in common with people generally. This is an outgrowth of Article III of the Constitution which limits the jurisdiction of federal courts to cases and controversies. U. S. Const., art. III, § 2" (citation and internal quotation marks omitted)).

decide whether petitioner had suffered a sufficient injury under Article III.

Similarly, in *Block* v. *Community Nutrition Institute*, 467 U. S. 340 (1984), the Court was faced with a choice between a statutory jurisdictional issue and a question of Article III standing. The Court of Appeals had held that the respondents had standing under both the statute and the Constitution. 698 F. 2d 1239, 1244–1252 (CADC 1983). On writ of certiorari to this Court, the United States, as petitioner, argued both issues: that the respondents did not come within the "zone of interests" of the statute, and that they did not have standing under Article III of the Constitution.[5] A unanimous Court bypassed the constitutional standing question in order to decide the statutory question. It therefore construed the statute, and concluded that respondents could not bring suit under the statute. The only mention of the constitutional question came in a footnote at the end of the opinion: "Since congressional preclusion of judicial review is in effect jurisdictional, we need not address the standing issue decided by the Court of Appeals in this case." *Block*, 467 U. S., at 353, n. 4 (citing *National Railroad Passenger Corp.*, 414 U. S., at 456, 465, and n. 13).

Finally, in *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91 (1979), we were also faced with a choice between a statutory and constitutional jurisdictional question. *Id.*, at 93 ("This case presents both statutory and constitutional questions concerning standing to sue under Title VIII"). The statutory question was whether respondents had standing to sue under § 812 of the Fair Housing Act. The Court,

---

[5] Brief for Petitioners in *Block* v. *Community Nutrition Institute*, O. T. 1983, No. 83–458, pp. 32–50 (arguing that respondents failed to meet the injury-in-fact and redressability requirements of Article III); see also Brief for Respondents in *Block* v. *Community Nutrition Institute*, O. T. 1983, No. 83–458, pp. 17–28; Reply Brief for Petitioners in *Block* v. *Community Nutrition Institute*, O. T. 1983, No. 83–458, pp. 15–17.

reluctant to address the constitutional question, opted to decide the statutory question first so as to avoid the constitutional question if possible:

> "The issue [of the meaning of § 812] is a critical one, for if the District Court correctly understood and applied § 812 [in denying respondents standing under the statute], we do not reach the question whether the minimum requirements of Art. III have been satisfied. If the Court of Appeals is correct [in holding that respondents have statutory standing], however, then the constitutional question is squarely presented." *Id.*, at 101.

See also *Bennett* v. *Spear*, 520 U. S. 154, 164 (1997) (footnote omitted) (opinion of SCALIA, J.) (stating that "[t]he first question in the present case is whether the [Endangered Species Act's] citizen-suit provision . . . negates the zone-of-interests test," and turning to the constitutional standing question only after determining that standing existed under the statute); *Food and Commercial Workers* v. *Brown Group, Inc.*, 517 U. S. 544, 548–550 (1996) (analyzing the statutory question before turning to the constitutional standing question); *Cross-Sound Ferry Services, Inc.* v. *ICC*, 934 F. 2d 327, 341 (CADC 1991) (Thomas, J., concurring in part and concurring in denial of petition for review) (courts exceed the scope of their power "only if the ground passed over is jurisdictional and the ground rested upon is non-jurisdictional, for courts properly rest on one jurisdictional ground instead of another"). Thus, our precedents clearly support the proposition that, given a choice between two jurisdictional questions—one statutory and the other constitutional—the Court has the power to answer the statutory question first.

Rather than framing the question in terms of "jurisdiction," it is also possible to characterize the statutory issue in this case as whether respondent's complaint states a "cause

of action."[6]   Framed this way, it is also clear that we have the power to decide the statutory question first.   As our holding in *Bell* v. *Hood*, 327 U. S. 678, 681–685 (1946), demonstrates, just as a court always has jurisdiction to determine its own jurisdiction, *United States* v. *Mine Workers*, 330 U. S. 258, 290 (1947), a federal court also has jurisdiction to decide whether a plaintiff who alleges that she has been injured by a violation of federal law has stated a cause of action.[7]   Indeed, *Bell* held that we have jurisdiction to decide this question *even when it is unclear whether the plaintiff's injuries can be redressed.*[8]   Thus, *Bell* demonstrates that the Court

---

[6] As Justice Cardozo stated, " ' "cause of action" may mean one thing for one purpose and something different for another.' "   *Davis* v. *Passman*, 442 U. S. 228, 237 (1979) (quoting *United States* v. *Memphis Cotton Oil Co.*, 288 U. S. 62, 67–68 (1933)).   Under one meaning of the term, it is clear that citizens have a "cause of action" to sue under the statute.   Under that meaning, "cause of action is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court."   *Davis*, 442 U. S., at 240, and n. 18 (emphasis deleted); see also *id.*, at 239 ("The concept of a 'cause of action' is employed specifically to determine *who* may judicially enforce the statutory rights or obligations" (emphasis added)).   Since EPCRA expressly gives citizens the right to sue, 42 U. S. C. § 11046(a)(1), there is no question that citizens are "member[s] of the class of litigants that may, as a matter of law, appropriately invoke the power of the court," *Davis*, 442 U. S., at 240, and n. 18.

[7] "Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover."   *Bell*, 327 U. S., at 682.

[8] In *Bell*, a precursor to *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), petitioners brought suit in federal court "to recover damages in excess of $3,000 from . . . agents of the Federal Bureau of Investigation" for allegedly violating their Fourth and Fifth Amendment rights.   327 U. S., at 679.   The question whether petitioners' injuries were redressable—"whether federal courts can grant money recovery for damages said to have been suffered as a result of federal officers violating the Fourth and Fifth Amendments"—was an open one, *id.*, at 684 (which the Court did not decide until *Bivens*, 403 U. S., at 389).   Nonetheless,

has the power to decide whether a cause of action exists even when it is unclear whether the plaintiff has standing.[9]

*National Railroad Passenger Corp.* also makes it clear that we have the power to decide this question before addressing other threshold issues. In that case, we were faced with the interrelated questions of "whether the Amtrak Act can be read to create a private right of action to enforce compliance with its provisions; whether a federal district court has jurisdiction under the terms of the Act to entertain such a suit [under 28 U. S. C. § 1337[10]]; and whether respondent has [statutory] standing to bring such a suit." 414 U. S., at 455–456. In choosing its method of analysis, the Court stated:

---

even though it was unclear whether there was a remedy, the Court held that federal courts have jurisdiction to determine whether a cause of action exists. 327 U. S., at 685.

[9] The Court incorrectly states that I "used to understand the fundamental distinction between arguing no cause of action and arguing no Article III redressability," *ante*, at 96. The Court gives me too much credit. I have never understood any fundamental difference between arguing: (1) plaintiff's complaint does not allege a cause of action because the law does "not provide a remedy" for the plaintiff's injury; and (2) plaintiff's injury is "not redressable." In *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U. S. 391, 398 (1979), we stated that the absence of a remedy, *i. e.,* the lack of redressability, was not the sort of jurisdictional issue that the Court raises on its own motion. That was the law when that case was decided, and it would still be the law today if the Court had not supplemented the standing analysis set forth in *Baker v. Carr,* 369 U. S. 186, 204 (1962), with its current fascination with "redressability." What has changed is not the admittedly imperfect state of my understanding, but rather the state of the Court's standing doctrine.

[10] Section 1337 states, in relevant part: "[D]istrict courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." 28 U. S. C. § 1337(a); see also *Potomac Passengers Assn. v. Chesapeake & Ohio R. Co.,* 475 F. 2d 325, 339 (CADC 1973), rev'd on other grounds, *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U. S. 453 (1974).

"[H]owever phrased, the *threshold question* clearly is whether the Amtrak Act or any other provision of law *creates a cause of action* whereby a private party such as the respondent can enforce duties and obligations imposed by the Act; for it is only if such a right of action exists that we need consider whether the respondent had standing to bring the action and whether the District Court had jurisdiction to entertain it." *Id.*, at 456 (emphasis added).[11]

After determining that there was no cause of action under the statute, the Court concluded: "Since we hold that no right of action exists, questions of standing and jurisdiction become immaterial." *Id.*, at 465, n. 13.[12]

Thus, regardless of whether we characterize this issue in terms of "jurisdiction" or "causes of action," the Court clearly has the power to address the statutory question first. *Gwaltney* itself powerfully demonstrates this point. As noted, that case involved a statutory question virtually identical to the one presented here—whether the statute permitted citizens to sue for wholly past violations. While the Court framed the question as one of "jurisdiction," *supra*, at 114, it could also be said that the case presented the question whether the plaintiffs had a "cause of action." Regardless of the label, the Court resolved the statutory question without pausing to consider whether the plaintiffs had standing

---

[11] The Court distinguished this "threshold question" from respondent's claim "on the merits," *id.*, at 455, n. 3.

[12] In insisting that the Article III standing question must be answered first, the Court finds itself in a logical dilemma. For if "A" (whether a cause of action exists) can be decided before "B" (whether there is statutory standing), *id.*, at 456, 465, n. 13; and if "B" (whether there is statutory standing) can be decided before "C" (whether there is Article III standing), *e. g.*, *Block* v. *Community Nutrition Institute*, 467 U. S. 340, 353, n. 4 (1984); then logic dictates that "A" (whether a cause of action exists) can be decided before "C" (whether there is Article III standing)—precisely the issue of this case.

to sue for wholly past violations.[13]   Of course, the fact that we did not discuss standing in *Gwaltney* does not establish that the plaintiffs had standing there.   Nonetheless, it supports the proposition that—regardless of how the issue is characterized—the Court has the power to address the virtually identical statutory question in this case as well.

The Court disagrees, arguing that the standing question must be addressed first.   Ironically, however, before "first" addressing standing, the Court takes a long excursion that entirely loses sight of the basic reason why standing is a matter of such importance to the proper functioning of the judicial process.   The "gist of the question of standing" is whether plaintiffs have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."[14]   The Court completely disregards this core purpose of standing in its discussion of "hypothetical jurisdiction."   Not only is that portion of the Court's opinion pure dictum because it is entirely unnecessary to an explanation of the Court's decision; it is also not informed by any adversary submission by either party. Neither the topic of "hypothetical jurisdiction," nor any of the cases analyzed, distinguished, and criticized in Part III, was the subject of any comment in any of the briefs submitted by the parties or their *amici*.   It therefore did not benefit from the "concrete adverseness" that the standing doctrine is meant to ensure.   The discussion, in short, "comes

---

[13] In *Gwaltney*, in addition to answering the question whether the statute confers jurisdiction over citizen suits for wholly past violations, we considered whether the allegation of ongoing injury sufficed to support jurisdiction.   The fact that we discussed "standing" in connection with that secondary issue, 484 U. S., at 65–66, adds significance to the omission of even a passing reference to any standing issue in connection with the principal holding.

[14] *Baker* v. *Carr*, 369 U. S., at 204.

to the same thing as an advisory opinion, disapproved by this Court from the beginning." *Ante*, at 101; see also *Muskrat v. United States*, 219 U. S. 346, 362 (1911) (stressing that Article III limits federal courts to "deciding cases or controversies arising between opposing parties").[15]

---

[15] The Court boldly distinguishes away no fewer than five of our precedents. In each of these five cases, the Court avoided deciding a jurisdictional issue by assuming that jurisdiction existed for the purpose of that case. In *Norton v. Mathews*, 427 U. S. 524, 532 (1976), for example, we stated:

"It . . . is evident that, whichever disposition we undertake, the effect is the same. It follows that there is no need to decide the theoretical question of jurisdiction in this case. In the past, we similarly have. reserved difficult questions of our jurisdiction when the case alternatively could be resolved on the merits in favor of the same party. See *Secretary of the Navy v. Avrech*, 418 U. S. 676 (1974). The Court has done this even when the original reason for granting certiorari was to resolve the jurisdictional issue. See *United States v. Augenblick*, 393 U. S. 348, 349–352 (1969). . . . Making the assumption, then, without deciding, that our jurisdiction in this cause is established, we affirm the judgment in favor of the Secretary . . . ."

See also *Philbrook v. Glodgett*, 421 U. S. 707, 720–722 (1975) (opinion of REHNQUIST, J.) (declining to reach "subtle and complex" jurisdictional issue and assuming that jurisdiction existed); *Secretary of Navy v. Avrech*, 418 U. S. 676, 677–678 (1974) *(per curiam)* ("[a]ssuming, *arguendo*, that the District Court had jurisdiction"; leaving "to a future case the resolution of the jurisdictional issue"); *Chandler v. Judicial Council of Tenth Circuit*, 398 U. S. 74, 89 (1970) ("Whether the Council's action was administrative action not reviewable in this Court, or whether it is reviewable here, plainly petitioner has not made a case for the extraordinary relief of mandamus or prohibition"); *United States v. Augenblick*, 393 U. S. 348, 351–352 (1969) (assuming, *arguendo*, that jurisdiction existed).

Moreover, in addition to the five cases that the Court distinguishes, there are other cases that support the notion that a court can assume jurisdiction. See, *e. g., Moor v. County of Alameda*, 411 U. S. 693, 715 (1973) ("Whether there exists judicial power to hear the state law claims against the County is, in short, a subtle and complex question with far-reaching implications. But we do not consider it appropriate to resolve this difficult issue in the present case, for we have concluded that even assuming, *arguendo*, the existence of power to hear the claim, the District Court [did not err]"); *Neese v. Southern R. Co.*, 350 U. S. 77 (1955) *(per*

The doctrine of "hypothetical jurisdiction" is irrelevant because this case presents us with a choice between two threshold questions that are intricately interrelated—as there is only a standing problem if the statute confers jurisdiction over suits for wholly past violations. The Court's opinion reflects this fact, as its analysis of the standing issue is predicated on the hypothesis that §326 may be read to confer jurisdiction over citizen suits for wholly past violations. If, as I think it should, the Court were to reject that hypothesis and construe §326,[16] the standing discussion

---

*curiam*) ("We reverse the judgment of the Court of Appeals without reaching the constitutional challenge to that court's jurisdiction . . . . Even assuming such appellate power to exist . . . , [the Court of Appeals erred]"); see also *Ellis* v. *Dyson*, 421 U. S. 426, 436 (1975) (REHNQUIST, J., concurring) ("While it would have been more in keeping with conventional adjudication had [the District Court] first inquired as to the existence of a case or controversy, . . . I cannot fault the District Court for disposing of the case on what it quite properly regarded at that time as an authoritative ground of decision. Indeed, this Court has on occasion followed essentially the same practice").

Because this case involves a choice between two threshold questions that are intricately interrelated, I do not take a position on the propriety of courts assuming jurisdiction. Nonetheless, I strongly disagree with the Court's decision to reach out and decide this question, especially in light of the fact that we have not had the benefit of briefing and argument. See *Philbrook*, 421 U. S., at 721 (opinion of REHNQUIST, J.) (declining to answer a "complex question of federal jurisdiction" because of "the absence of substantial aid from the briefs of either of the parties"); *Avrech*, 418 U. S., at 677 ("Without the benefit of further oral argument, we are unwilling to decide the difficult jurisdictional issue which the parties have briefed"); *ante*, at 99 (noting that the *Avrech* Court "was unwilling to decide the jurisdictional question without oral argument" and emphasizing the importance of zealous advocacy to sharpen issues).

[16] Indeed, the Court acknowledges—as it must—that the Court has the power to construe the statute, as it is impossible to resolve the standing issue without construing some provisions of EPCRA. Thus, in order to determine whether respondent's investigation and prosecution costs are sufficient to confer standing, the Court construes §326(f) of EPCRA, which authorizes the district court to "award costs of litigation" to the prevailing party. *Ante*, at 107–108. Yet if §326(f) were construed to

would be entirely unnecessary. Thus, ironically, the Court is engaged in a version of the "hypothetical jurisdiction" that. it has taken pains to condemn at some length.

## II

There is an important reason for addressing the statutory question first: to avoid unnecessarily passing on an undecided constitutional question. *New York Transit Authority* v. *Beazer,* 440 U. S. 568, 582–583 (1979); *Ashwander* v. *TVA,* 297 U. S. 288, 345–348 (1936) (Brandeis, J., concurring).[17] Whether correct or incorrect, the Court's constitutional holding represents a significant extension of prior case law.

The Court's conclusion that respondent does not have standing comes from a mechanistic application of the "redressability" aspect of our standing doctrine. "Redressability," of course, does not appear anywhere in the text of the Constitution. Instead, it is a judicial creation of the past 25 years, see *Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26, 38, 41–46 (1976); *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 617–618 (1973)—a judicial interpretation of the "Case" requirement of Article III, *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 559–561 (1992).[18]

---

cover the cost of the investigation that preceded the filing of respondent's complaint, even under the Court's reasoning respondent would have alleged a "redressable" injury and would have standing. See *ibid.*

[17] There are two other reasons that counsel in favor of answering the statutory question first. First, it is the statutory question that has divided the courts of appeals and that we granted certiorari to resolve. See Pet. for Cert. i. Second, the meaning of the statute is a matter of general and national importance, whereas the Court's answer to the constitutional question depends largely on a construction of the allegations of this particular complaint, *ante,* at 104 ("We turn now to the particulars of respondent's complaint to see how it measures up to Article III's requirements").

[18] In an attempt to demonstrate that redressability has always been a component of the standing doctrine, the Court cites our decision in *Marye* v. *Parsons,* 114 U. S. 325 (1885), a case in which neither the word "standing" nor the word "redressability" appears.

In every previous case in which the Court has denied standing because of a lack of redressability, the plaintiff was challenging some governmental action or inaction. *Leeke* v. *Timmerman,* 454 U. S. 83, 85–87 (1981) *(per curiam)* (suit against Director of the Department of Corrections and another prison official); *Simon,* 426 U. S., at 28 (suit against the Secretary of the Treasury and the Commissioner of Internal Revenue); *Warth* v. *Seldin,* 422 U. S. 490, 493 (1975) (suit against the town of Penfield and members of Penfield's Zoning, Planning, and Town Boards); *Linda R. S.,* 410 U. S., at 615–616, 619 (suit against prosecutor); see also *Renne* v. *Geary,* 501 U. S. 312, 314 (1991) (suit against the city and County of San Francisco, its board of supervisors, and other local officials).[19] None of these cases involved an attempt by one private party to impose a statutory sanction on another private party.[20]

In addition, in every other case in which this Court has held that there is no standing because of a lack of redressability, the injury to the plaintiff by the defendant was *indirect* (*e. g.,* dependent on the action of a third party). This is true in the two cases that the Court cites for the "redressability" prong, *ante,* at 103; see also *Simon,* 426 U. S., at 40–46 ("[T]he 'case or controversy' limitation of Art. III . . . requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant,

---

[19] Although the Court discussed redressability, *Renne* did not in fact turn on that issue. While the Court stated that "[t]here is reason to doubt . . . that the injury alleged . . . can be redressed" by the relief sought, 501 U. S., at 319, it then went on to hold that the claims were nonjusticiable because "respondents have not demonstrated a live controversy ripe for resolution by the federal courts," *id.,* at 315, 320–324.

[20] This distinction is significant, as our standing doctrine is rooted in separation-of-powers concerns. *E. g., Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 573–578 (1992); *Allen* v. *Wright,* 468 U. S. 737, 750 (1984); see also *infra,* at 129–130.

*and not injury that results from the independent action of some third party not before the court"* (emphasis added)); *Warth,* 422 U. S., at 504–508 (stating that "the indirectness of the injury . . . may make it substantially more difficult to meet the minimum requirement of Art. III," and holding that the injury at issue was too indirect to be redressable), as well as in every other case in which the Court denied standing because of a lack of redressability, *Leeke,* 454 U. S., at 86–87 (injury indirect because it turned on the action of a prosecutor, a party not before the Court); *Linda R. S.,* 410 U. S., at 617–618 (stating that "[t]he party who invokes [judicial] power must be able to show . . . that he has sustained or is immediately in danger of sustaining some *direct* injury" (emphasis in original) (internal quotation marks omitted); injury indirect because it turned on the action of the father, a party not before the Court); see also 3 K. Davis & R. Pierce, Administrative Law Treatise 30 (3d ed. 1994).[21]   Thus, as far as I am aware, the Court has never held—until today—that a plaintiff who is *directly injured*[22] by a defendant lacks standing to sue because of a lack of redressability.[23]

---

[21] "It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action . . . ." *Ex parte Lévitt,* 302 U. S. 633, 634 (1937).

[22] Assuming that EPCRA authorizes suits for wholly past violations, then Congress has created a legal right in having EPCRA reports filed on time.   Although this is not a traditional injury:

"[W]e must be sensitive to the articulation of new rights of action that do not have clear analogs in our common-law tradition. . . . Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before . . . ." *Lujan* v. *Defenders of Wildlife,* 504 U. S., at 580 (KENNEDY, J., concurring in part and concurring in judgment); see also *Havens Realty Corp.* v. *Coleman,* 455 U. S. 363, 373–374 (1982); *Warth* v. *Seldin,* 422 U. S. 490, 500 (1975).

[23] In another context, the Court has specified that there is a critical distinction between whether a defendant is directly or indirectly harmed. In *Lujan* v. *Defenders of Wildlife,* a case involving a challenge to Executive action, the Court stated:

The Court acknowledges that respondent would have had standing if Congress had authorized some payment to respondent. *Ante,* at 106 ("[T]he civil penalties authorized by the statute . . . might be viewed as a sort of compensation or redress to respondent if they were payable to respondent"). Yet the Court fails to specify why payment to respondent—even if only a peppercorn—would redress respondent's injuries, while payment to the Treasury does not. Respondent clearly believes that the punishment of Steel Company, along with future deterrence of Steel Company and others, redresses its injury, and there is no basis in our previous standing holdings to suggest otherwise.

When one private party is injured by another, the injury can be redressed in at least two ways: by awarding compensatory damages or by imposing a sanction on the wrongdoer that will minimize the risk that the harm-causing conduct will be repeated. Thus, in some cases a tort is redressed by an award of punitive damages; even when such damages are payable to the sovereign, they provide a form of redress for the individual as well.

History supports the proposition that punishment or deterrence can redress an injury. In past centuries in England,[24] in the American Colonies, and in the United

"When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." 504 U. S., at 561–562 (emphasis in original).

[24] "Several scholars have attempted to trace the historical origins of private prosecution in the United States. Without exception, these scholars have determined that the notion of private prosecutions originated in

States,[25] private persons regularly prosecuted criminal cases. The interest in punishing the defendant and deterring violations of law by the defendant and others was sufficient to support the "standing" of the private prosecutor even if the only remedy was the sentencing of the defendant to jail or to the gallows. Given this history, the Framers of Article III surely would have considered such proceedings to be "Cases" that would "redress" an injury even though the party bringing suit did not receive any monetary compensation.[26]

The Court's expanded interpretation of the redressability requirement has another consequence. Under EPCRA,

---

early common law England, where the legal system primarily relied upon the victim or the victim's relatives or friends to bring a criminal to justice. According to these historians, private prosecutions developed in England as a means of facilitating private vengeance." Bessler, The Public Interest and the Unconstitutionality of Private Prosecutors, 47 Ark. L. Rev. 511, 515 (1994) (footnotes omitted).

[25] "American citizens continued to privately prosecute criminal cases in many locales during the nineteenth century. In Philadelphia, for example, all types of cases were privately prosecuted, with assault and battery prosecutions being the most common. However, domestic disputes short of assault also came before the court. Thus, 'parents of young women prosecuted men for seduction; husbands prosecuted their wives' paramours for adultery; wives prosecuted their husbands for desertion.' Although many state courts continued to sanction the practice of private prosecutions without significant scrutiny during the nineteenth century, a few state courts outlawed the practice." Id., at 518–519 (footnotes omitted); A. Steinberg, The Transformation of Criminal Justice: Philadelphia, 1800–1880, p. 5 (1989) ("Private prosecution and the minor judiciary were firmly rooted in Philadelphia's colonial past. Both were examples of the creative American adaptation of the English common law. By the 17th century, private prosecution was a fundamental part of English common law"); see also F. Goodnow, Principles of the Administrative Law of the United States 412–413 (1905).

[26] When such a party obtains a judgment that imposes sanctions on the wrongdoer, it is proper to presume that the wrongdoer will be less likely to repeat the injurious conduct that prompted the litigation. The lessening of the risk of future harm is a concrete benefit.

Congress gave enforcement power to state and local governments. 42 U. S. C. § 11046(a)(2). Under the Court's reasoning, however, state and local governments would not have standing to sue for past violations, as a payment to the Treasury would no more "redress" the injury of these governments than it would redress respondent's injury. This would be true *even if Congress explicitly granted state and local governments this power.* Such a conclusion is unprecedented.

It could be argued that the Court's decision is rooted in another separation-of-powers concern: that this citizen suit somehow interferes with the Executive's power to "take Care that the Laws be faithfully executed," Art. II, § 3. It is hard to see, however, how EPCRA's citizen-suit provision impinges on the power of the Executive. As an initial matter, this is not a case in which respondent merely possesses the " 'undifferentiated public interest' " in seeing EPCRA enforced. *Ante,* at 106; see also *Lujan* v. *Defenders of Wildlife,* 504 U. S., at 577. Here, respondent—whose members live near Steel Company—has alleged a sufficiently particularized injury under our precedents. App. 5 (complaint alleges that respondent's members "reside, own property, engage in recreational activities, breathe the air, and/or use areas near [Steel Company's] facility").

Moreover, under the Court's own reasoning, respondent would have had standing if Congress had authorized some payment to respondent. *Ante,* at 106 ("[T]he civil penalties authorized by the statute . . . might be viewed as a sort of compensation or redress to respondent if they were payable to respondent"). This conclusion is unexceptional given that respondent has a more particularized interest than a plaintiff in a *qui tam* suit, an action that is deeply rooted in our history. *United States ex rel. Marcus* v. *Hess,* 317 U. S. 537, 541, n. 4 (1943) (" 'Statutes providing for actions by a common informer, who himself has no interest whatever in the controversy other than that given by statute, have been in

existence for hundreds of years in England, and in this country ever since the foundation of our Government'" (quoting *Marvin* v. *Trout*, 199 U. S. 212, 225 (1905)); *Adams* v. *Woods*, 2 Cranch 336, 341 (1805) (opinion of Marshall, C. J.) ("Almost every fine or forfeiture under a penal statute, may be recovered by an action of debt *[qui tam]* as well as by information [by a public prosecutor]"); 3 W. Blackstone, Commentaries 160 (1768); Caminker, The Constitutionality of *Qui Tam* Actions, 99 Yale L. J. 341, 342, and n. 3 (1989) (describing *qui tam* actions authorized by First Congress); see also *Lujan* v. *Defenders of Wildlife*, 504 U. S., at 572–573.

Yet it is unclear why the separation-of-powers question should turn on whether the plaintiff receives monetary compensation. In either instance, a private citizen is enforcing the law. If separation of powers does not preclude standing when Congress creates a legal right that authorizes compensation to the plaintiff, it is unclear why separation of powers should dictate a contrary result when Congress has created a legal right but has directed that payment be made to the Federal Treasury.

Indeed, in this case (assuming for present purposes that respondent correctly reads the statute) not only has Congress authorized standing, but the Executive Branch has also endorsed its interpretation of Article III. Brief for United States as *Amicus Curiae* 7–30. It is this Court's decision, not anything that Congress or the Executive has done, that encroaches on the domain of other branches of the Federal Government.[27]

_____

[27] Ironically, although the Court insists that the standing question must be answered first, it relies on the merits when it answers the standing question. Proof that Steel Company repeatedly violated the law by failing to file EPCRA reports for eight years should suffice to establish the District Court's power to impose sanctions, or at least to decide what sanction, if any, is appropriate. Evidence that Steel Company was ignorant of the law and has taken steps to avoid future violations is highly relevant to the merits of the question whether any remedy is necessary, but surely does not deprive the District Court of the power to decide the

It is thus quite clear that the Court's holding today represents a significant new development in our constitutional jurisprudence. Moreover, it is equally clear that the Court has the power to answer the statutory question first. It is, therefore, not necessary to reject the Court's resolution of the standing issue in order to conclude that it would be prudent to answer the question of statutory construction before announcing new constitutional doctrine.

## III

EPCRA's citizen-suit provision states, in relevant part:

> "[A]ny person may commence a civil action on his own behalf against . . . [a]n owner or operator of a facility for failure to do any of the following: . . . Complete and submit an inventory form under section 11022(a) of this title . . . [or] [c]omplete and submit a toxic chemical release form under section 11023(a) of this title." 42 U. S. C. §§ 11046(a)(1)(A)(iii)–(iv).

Unfortunately, this language is ambiguous. It could mean, as the Sixth Circuit has held, that a citizen only has the right to sue for a "failure . . . to complete and submit" the required forms. Under this reading, once the owner or operator has filed the forms, the district court no longer has jurisdiction. _Atlantic States Legal Foundation_ v. _United Musical,_ 61 F. 3d 473, 475 (1995). Alternatively, it could be, as the Seventh Circuit held, that the phrases "under section 11022(a)" and "under section 11023(a)" incorporate the requirements of those sections, including the requirement that the reports be filed by particular dates. 90 F. 3d 1237, 1243 (1996).

---

remedy issue. Cf. _United States_ v. _W. T. Grant Co.,_ 345 U. S. 629, 633 (1953) ("Here the defendants told the court that the interlocks no longer existed and disclaimed any intention to revive them. Such a profession does not suffice to make a case moot although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts").

Although the language of the citizen-suit provision is ambiguous, other sections of EPCRA indicate that Congress did not intend to confer jurisdiction over citizen suits for wholly past violations. First, EPCRA requires the private litigant to give the alleged violator notice at least 60 days before bringing suit. 42 U. S. C. § 11046(d)(1).[28] In *Gwaltney*, we considered the import of a substantially identical notice requirement, and concluded that it indicated a congressional intent to allow suit only for ongoing and future violations:

> "[T]he purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit. If we assume, as respondents urge, that citizen suits may target wholly past violations, the requirement of notice to the alleged violator becomes gratuitous. Indeed, respondents, in propounding their interpretation of the Act, can think of no reason for Congress to require such notice other than that 'it seemed right' to inform an alleged violator that it was about to be sued. Brief for Respondents 14." 484 U. S., at 60.

Second, EPCRA places a ban on citizen suits once EPA has commenced an enforcement action. 42 U. S C. § 11046(e).[29] In *Gwaltney*, we considered a similar provision and concluded that it indicated a congressional intent to prohibit citizen suits for wholly past violations:

---

[28] "No action may be commenced under subsection (a)(1)(A) of this section prior to 60 days after the plaintiff has given notice of the alleged violation to the Administrator, the State in which the alleged violation occurs, and the alleged violator. Notice under this paragraph shall be given in such manner as the Administrator shall prescribe by regulation."

[29] "No action may be commenced under subsection (a) of this section against an owner or operator of a facility if the Administrator has commenced and is diligently pursuing an administrative order or civil action to enforce the requirement concerned or to impose a civil penalty under this Act with respect to the violation of the requirement."

"The bar on citizen suits when governmental enforcement action is under way suggests that the citizen suit is meant to supplement rather than supplant governmental action. . . . Permitting citizen suits for wholly past violations of the Act could undermine the supplementary role envisioned for the citizen suit. This danger is best illustrated by an example. Suppose that the Administrator identified a violator of the Act and issued a compliance order . . . . Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably. The same might be said of the discretion of state enforcement authorities. Respondents' interpretation of the scope of the citizen suit would change the nature of the citizens' role from interstitial to potentially intrusive." 484 U. S., at 60–61.

Finally, even if these two provisions did not resolve the issue, our settled policy of adopting acceptable constructions of statutory provisions in order to avoid the unnecessary adjudication of constitutional questions—here, the unresolved standing question—strongly supports a construction of the statute that does not authorize suits for wholly past violations. As we stated in *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988): "This cardinal principle has its roots in Chief Justice Marshall's opinion for the Court in *Murray* v. *Schooner Charming Betsy*, 2 Cranch 64, 118 (1804), and has for so long been applied by this Court that it is beyond debate." See also *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490,

500–501 (1979); *Machinists* v. *Street,* 367 U. S. 740, 749–750 (1961); *Crowell* v. *Benson,* 285 U. S. 22, 62 (1932); *Lucas* v. *Alexander,* 279 U. S. 573, 577 (1929); *Panama R. Co.* v. *Johnson,* 264 U. S. 375, 390 (1924); *United States ex rel. Attorney General* v. *Delaware & Hudson Co.,* 213 U. S. 366, 407–408 (1909); *Parsons* v. *Bedford,* 3 Pet. 433, 448–449 (1830) (opinion of Story, J.).

IV

For these reasons, I concur in the Court's judgment, but do not join its opinion.

JUSTICE GINSBURG, concurring in the judgment.

Congress has authorized citizen suits to enforce the Emergency Planning and Community Right-To-Know Act of 1986, 42 U. S. C. § 11001 *et seq.* Does that authorization, as Congress designed it, permit citizen suits for wholly past violations? For the reasons stated by JUSTICE STEVENS in Part III of his opinion, I agree that the answer is "No." I would follow the path this Court marked in *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.,* 484 U. S. 49, 60–61 (1987), and resist expounding or offering advice on the constitutionality of what Congress might have done, but did not do.