**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 05a0459n.06**
**Filed: June 2, 2005**

**Nos. 04-3541/3716**

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| 1064 OLD RIVER ROAD, INC., d/b/a the Beach Club, and CURTIS KNOWLES, | ) ) ) | |
| Plaintiffs-Appellants (04-3541), | ) ) | |
| v. | ) ) | |
| CITY OF CLEVELAND, FRED SZABO, ROBERT VILKAS, and MICHAEL R. WHITE, | ) ) ) ) | |
| Defendants-Appellants, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| JELLY ROLLS, INC., d/b/a the Basement, | ) ) ) | |
| Plaintiff-Appellant (04-3716), | ) ) | |
| v. | ) ) | |
| CITY OF CLEVELAND and ROBERT VILKAS, | ) ) ) | |
| Defendants-Appellees. | ) | |

Before:  COLE and SUTTON, Circuit Judges; BARZILAY, Judge.[*]

---

[*] The Honorable Judith M. Barzilay, Judge for the United States Court of International Trade, sitting by designation.

SUTTON, Circuit Judge.   In these cases, which we have consolidated for appeal, two dance clubs located in "the Flats" of downtown Cleveland, Ohio, challenge the validity of inspections conducted by the city, claiming that the city (and several city officials) unfairly singled them out for inspection in violation of the Equal Protection Clause and that the searches violated the Fourth Amendment.  One of the clubs also claims that the inspection violated its procedural and substantive due process rights under the Fourteenth Amendment.   Because the defendants had rational explanations for choosing to inspect these dance clubs, because no search occurred under the Fourth Amendment and because the defendants committed no due process violations, we affirm the district court's grant of summary judgment in both cases.

I.

In early 2001, the city of Cleveland formed a task force to address safety issues in the Flats, a section of downtown Cleveland that covers both sides of the Cuyahoga River where it flows into Lake Erie and that contains restaurants, bars and dance clubs.  According to Michael White, the mayor of Cleveland at the time, the Flats Safety Task Force was created in response to "a number of incidents in the Flats dealing with safety," including: "[f]ights, deaths, people falling in the water and drowning to death, being crushed by boats, allegations of alcohol abuse, [and] issues of safety." Beach Club JA 651–52; Basement JA 604–05.

The task force included representatives from the major departments of the city, several owners of businesses in the Flats and federal entities with responsibility in the area such as the Coast

Guard. The city did not invite either the Beach Club (the business name of 1064 Old River Road, one of the plaintiffs in this case) or the Basement (the business name of Jelly Rolls, Inc., the other plaintiff) to participate in the task force. One of the members of the task force, though, was the Flats Oxbow Association, an organization that represents the interests of all businesses in the Flats. When questioned why certain businesses were not asked to be on the committee, the mayor responded that "you can't have a working committee of 150 people." Beach Club JA 655; Basement JA 608. Noting that there were roughly 100 businesses in the Flats, he explained that the "goal was to get a representative sampling of those [businesses]." Beach Club JA 655; Basement JA 608.

To determine which businesses to subject to initial inspections, the task force considered "records of arrest, criminal activity, nuisance activity," "records of overcrowding issues, fire violations," and records of problems identified by building and housing authorities. Beach Club JA 512; Basement JA 465. On March 1, 2001, Fred Szabo, the acting safety director of the city, sent an e-mail to the task force identifying six "targeted locations," which included the Beach Club and the Basement. "These locations," the e-mail explained, "have a documented history of alcohol sales to underage patrons and have demonstrated a high incidence of nuisance offenses including assaults, disorderly conduct, open container and violations of State Drug Law." Beach Club JA 206; Basement JA 379. Consistent with this approach, the Beach Club had been the subject of an underage drinking violation on February 8, 2001. Similarly, the Basement had been the scene of several fights, at least two underage drinking incidents during the preceding five years, a building-code and fire-code violation involving a tent covering a rooftop patio that had heaters attached to

it, and a fire-code violation dating back to August 11, 1999, for failing to have the sprinkler system set up so that it would notify someone outside the Basement if it went off.

On March 10, 2001, at 11:30 p.m., the city brought several police officers, city inspectors, and city officials to the Beach Club and to the Basement (along with several other establishments) and inspected them. During the inspections, they turned the lights on and the music off to check patrons' identification for underage drinking. No drinking violations were discovered at either club, but building and fire inspectors found a number of other violations. At the Beach Club, inspectors found that the club had only one way of ingress and egress. (When the prior occupants of the Beach Club received a certificate of occupancy in 1986, the building had a second exit through a back patio, but in 1996, without permission from the city, the Beach Club erected a fence around the patio that closed off that exit.) At the Basement, the city's inspectors found serious electrical hazards, serious plumbing hazards and a continuing fire hazard caused by the tent on the roof patio. Concluding that the violation uncovered at the Beach Club presented a "life safety problem," Beach Club JA 630, and that the hazards found at the Basement "pose[d] imminent physical danger," Basement JA 591, the city closed down both clubs and issued orders to vacate them. All told, the city inspected ten or eleven establishments that evening, closing six and leaving four or five of them open.

The Beach Club and Curtis Knowles, the Beach Club's president, sued the city (and White, Szabo and Vilkas) in state court under § 1983 and state law, alleging seven counts, and the Basement, represented by the same lawyers, filed a similar complaint against the city (and Vilkas).

In each case, the city (1) counterclaimed for the costs of boarding up the club and for inspection fees to cover the cost of follow-up inspections and (2) removed the case to federal court. In each case, the city moved for summary judgment on all claims save the § 1983 claim, and in each case the district court granted the motion for summary judgment. The city then moved in each case for summary judgment on the § 1983 claims and the counterclaims, and the district court eventually granted those motions as well.

Before turning to the merits of the appeal, it is worth highlighting one procedural difference between the cases. After the city (and Vilkas) filed a motion for judgment on the pleadings against the Basement, the Basement amended its complaint. Although the original Basement complaint addressed an inspection by the city on March 10, 2001, at 1078 Old River Road—the correct address of the Basement—the first amended complaint alleged claims resulting from an inspection by the city on March 23, 2001, at 1229 West 6th Street. Jelly Rolls' president and owner of 80% of its shares, Gary Bauer, admitted during a deposition that he did not "own, lease, or operate any business" at 1229 West 6th Street. Basement JA 404. This first amended complaint, which the Basement asserts states the wrong date and wrong location, was filed on August 18, 2003. On September 3, 2003, the city answered the first amended complaint by denying each and every allegation and by asserting as its first affirmative defense that the Basement lacked standing to bring the action. In the district court's summary judgment decision on the Basement's § 1983 claim, the district court alternatively premised its decision on the ground that the Basement lacked standing because it had failed to show that it, as opposed to a third party, had been injured.

II.

The rules for reviewing a district court's grant of summary judgment are familiar. We give fresh review to the decision and will affirm the decision when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 802 (6th Cir. 2005); Fed. R. Civ. P. 56(c). In doing each of these things, we look at the facts in the light most favorable to the nonmoving party. *LensCrafters*, 403 F.3d at 802.

**Standing.** Before turning to the merits, we must address the plaintiffs' standing to raise several constitutional claims and we must do so even though some of those constitutional claims are easier to resolve than the standing question attached to them. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 99 (1998) (rejecting as "precedent-shattering" the proposition that "an 'easy' merits question may be decided *on the assumption* of jurisdiction"); *id.* at 101 ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning."). Standing is an "irreducible constitutional minimum" consisting of three elements: injury in fact, causation (whether the injury is fairly traceable to the defendant) and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[E]ach element [of Article III standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* At the summary judgment stage, therefore, a "plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit

or other evidence 'specific facts,' Fed. R. Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Id.*

**The Basement's Standing to Bring its Claims**. Only the first of these requirements is at issue with respect to the Basement's claims, namely whether the plaintiff "suffered an injury in fact." *Id.* at 561. In its first amended complaint, the Basement alleged that on "March 23, 2001, *Plaintiff's building located at* 1229 W. 6th Street, Cleveland, Ohio, was raided." Basement JA 84 (emphasis added). This statement, it turns out, contains one accurate statement ("Plaintiff's building" was inspected) and two inaccurate statements (the task force inspection occurred on a different date and the Basement has a different address). The mistake occurred because the Basement inadvertently copied the wrong address and date from a "nearly identical" complaint against the city that its lawyers had drafted for "another entity" inspected by the city. Basement Br. at 24 & n.3. Supporting the accurate assertion in the complaint that the Basement had been raided, Gary Bauer, the president of the Basement, stated in his affidavit that he owns the Basement and that it was in fact "raided" on March 10, 2001. JA 296. The city does not provide any evidence attempting to counter the evidence provided by this affidavit or any evidence attempting to counter the accurate portion of the complaint. And the city's own motion for summary judgment attached evidence demonstrating that Gary Bauer owned the building at 1078 Old River Road, *see* JA 232 (certificate of occupancy), and the city admits both that the Basement is located at 1078 Old River Road and that the city inspected the Basement on March 10, 2001. City Br. at 2–3.

All of this shows that the city at best has established an ambiguity in the complaint about whether the Basement was inspected by the task force, not an absence of standing as to whether the

Basement may challenge this inspection. While the first amended complaint alleges that the challenged raid occurred at 1229 West 6th Street on March 23, 2001, the summary judgment posture of this case requires us to resolve all factual ambiguities in favor of the Basement, the nonmoving party here, and thus requires us to conclude for purposes of this motion that the events occurred at 1078 Old River Road on March 10. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181–82 (2000) (looking at affidavits of the plaintiff to determine whether sufficient injury had been demonstrated to establish standing). On this record, the Basement has shown that it has standing to bring its due process claims.

**Knowles' Standing to Bring his Claims.** Knowles, the owner of the Beach Club, contends that the district court erred in holding that he personally lacked standing to bring several claims identical to those brought by the Beach Club. We need not address his argument because the presence of one party that has standing to bring a claim suffices to make identical claims brought by other parties to the same lawsuit justiciable. *Department of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999); *see also Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 827 n.1 (2002) ("Because we are likewise satisfied that Earls has standing, we need not address whether James also has standing."); *Clinton v. City of New York*, 524 U.S. 417, 431 (1998) ("Because both the City of New York and the health care appellees have standing, we need not consider whether the appellee unions also have standing to sue."). No one (including us) doubts that the Beach Club has standing to bring its Equal Protection and Fourth Amendment claims. Accordingly, our resolution of those claims effectively resolves the identical

claims brought by Knowles, without regard to whether Knowles has standing in his own right to bring the claims.

**The Equal Protection Claim**. In challenging the district court's disposition of their equal protection claim, the clubs argue that the city had no rational basis first for excluding them from participating in the task force and then for inspecting them rather than other establishments during the Task Force's initial inspection. Acknowledging that they are not a suspect class specially protected by the Equal Protection Clause, they instead bring a "class of one" equal protection claim, which the courts have permitted where the plaintiff "has been intentionally treated differently from others similarly situated and [ ] there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The clubs bear the burden of showing that there was no conceivable rational basis for the disparate treatment. *Muller v. Lujan*, 928 F.2d 207, 210 (6th Cir. 1991).

The clubs cannot satisfy this daunting standard. As to the decision not to include the clubs in the Task Force, the city had an eminently rational explanation: The committee would be too large if every business participated, and both clubs, like other small businesses in the Flats, were represented on the task force by the Flats Oxbow Association. The clubs' challenge to the second decision—to investigate them rather than other establishments—fares no better because the clubs cannot show that they were "treated differently from others similarly situated." *Id.* The Beach Club, a dance club located in the Flats at which an underage drinking arrest had occurred during the prior month, fails to identify any similar business in the Flats that also had a recent underage drinking

violation but yet was not inspected. The Basement likewise fails to identify any business with a similar history of fights, underage drinking, building-code violations and fire-code violations that was not inspected. In the final analysis, the history of violations at each club gave the city an ample—and certainly rational—explanation for initially choosing them rather than other clubs for inspection.

Even though they have failed to establish disparate treatment or the absence of a rational basis for the city's conduct, the clubs claim that *Bower v. Village of Mount Sterling*, 44 Fed. Appx. 670 (6th Cir. 2002), an unpublished equal protection decision, nonetheless supports their claim. In *Bower*, a police dispatcher accused of sexual harassment was not discharged from his dispatching position, was appointed to the police reserve and was subsequently recommended by the chief of police for promotion as a full-time officer. When the city council refused to promote him to a full-time officer position, he brought an equal protection claim, contending that the council had promoted other officers under materially similar circumstances. In concluding that his claim should go to a jury, this court held that the reasons offered by the city for its decision did not meaningfully distinguish the plaintiff's application from those of other applicants. Here, by contrast, the city relied on a distinction— between establishments where underage drinking or other safety violations had been discovered and those where they had not been—that was (and is) highly relevant to its public safety mission. And while the clubs try to characterize the creation of the task force as focusing solely on preventing additional *drownings* in the Flats, the record shows that the task force

existed to confront a number of problems, including "allegations of alcohol abuse" and "issues of

safety." Beach Club JA 651–52; Basement JA 604–05.

**The Fourth Amendment Claim.** The clubs next argue that the district court erred in

rejecting their illegal-search claim as a matter of law. We disagree.

"A search occurs when 'an expectation of privacy that society is prepared to consider

reasonable is infringed.'" *Maryland v. Macon*, 472 U.S. 463, 469 (1985). A business alleging a

Fourth Amendment violation does "not have any reasonable expectation of privacy in areas of the

store where the public was invited to enter and to transact business." *Id.* At the same time, the

Court has explained that heavily regulated industries, including establishments that sell liquor, have

diminished expectations of privacy. *See United States v. Biswell*, 406 U.S. 311, 314–17 (1972); *see

also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995).

Consistent with *Macon* and *Biswell*, the various inspectors entered the Beach Club and the

Basement while the clubs were open for business, and neither club argues that the inspectors went

beyond areas open to the public. Since the clubs were open to the public at the time the inspections

occurred, they had no expectation of privacy, and the inspectors, no less than ordinary patrons, were

free to enter the clubs and observe all that was within plain view. Bolstering this conclusion is the

fact that the clubs, as they readily concede, Beach Club Br. at 28, Basement Br. at 34, are closely

regulated businesses under state law and accordingly have a diminished expectation of privacy in

those businesses.

Attempting to counter the conclusion that a Fourth Amendment search did not occur, the clubs point to § 3103.04 of the Cleveland Codified Ordinances, which says that building inspections may occur only at a "reasonable hour" and only after getting permission from the occupant or obtaining a search warrant. The short answer to this point is that a city ordinance generally cannot control the meaning of a "search" under the Fourth Amendment. *Cf. City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). Even if the city violated its own ordinance—which, as we will explain later, it did not—that does not prove a Fourth Amendment violation occurred.

**Counterclaims for Costs and Inspection Fees**. The clubs next claim that they should not have to pay the city for the board-up costs and inspection fees that resulted from the city's "illegal" actions. Neither club cites any case law in support of this argument. And the premise of the argument—that the city acted illegally—is wrong in any event. As we have shown, the city's inspection did not violate federal law.

And neither did the inspection violate any city law. Section 3103.04 of the Cleveland Codified Ordinances permits fire inspectors and building inspectors

> at any reasonable hour [to] enter any dwelling, multifamily dwelling, building, structure, or premises within the City to perform any duty imposed on them by [the Ohio Building Code] or this Building Code, or the City Housing or Fire Prevention Codes, provided that permission to enter is obtained from the occupant . . . . If such permission is refused or is otherwise unobtainable, a search warrant shall be obtained before such entry or inspection is made, except in the case of an existing emergency in which case entry may be made at any time and no search warrant is necessary.

A period when a business is open to the public is assuredly not an unreasonable hour to conduct an inspection, and plaintiffs do not argue otherwise. And a business that is open to all members of the

public means just that: It grants "permission to enter" the premises to all members of the public, whether they are building inspectors or not. *See State v. Howell*, No. 1679, 1991 WL 87289, at *3 (Ohio Ct. App. 1991) ("[A] law enforcement officer is a member of the public and, just like any citizen, may accept a general public invitation to enter upon commercial premises which are open to the public."); *see also State v. Thompson*, 971 P.2d 879, 888 n.8 (Or. 1999) (noting that the phrase "open to the public" means, under a state statute, "premises which by their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe that no permission to enter or remain is required"); *Miller v. State*, 733 So.2d 955, 957 (Fla. 1998) (explaining that because "premises are either open to the public or they are not," a defendant who can establish that premises were open to the public has a complete defense to a burglary charge) (citations omitted).

All of this leaves little left to debate about the clubs' argument that they should not have to pay for the costs of the inspection and the shutting down of the clubs. The clubs do not otherwise contest the district court's application of the Cleveland ordinances requiring owners to pay for the expenses of a board-up, *see* Cleveland, Oh., Charter & Codified Ordinances § 3103.09(j), and requiring owners to pay a fee for follow-up inspections made after the compliance date in the violation notice, *see id.* § 3105.26(a)(4). Because they are mistaken in claiming that the city entered the premises illegally, the district court correctly granted the city summary judgment on its counterclaims against each club.

**The Basement's Due Process Claims.** In the same section of its brief in which it challenges the search as a Fourth Amendment violation, the Basement mentions that the district erred in rejecting its procedural due process claim that the inspection exceeded the scope of the city's authority and was executed in bad faith. Basement Br. at 34. Despite this statement, the Basement does not proceed to make a procedural-due-process argument, *see id.*—or explain how an alleged Fourth Amendment violation equates to a procedural-due-process claim—and so it has waived this argument. *See United States v. Demjanjuk*, 367 F.3d 623, 638 (6th Cir. 2004) ("[I]ssues adverted to [on appeal] in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (quotation marks omitted).

The Basement's substantive due process claim, which has been briefed, fares no better. At bottom, this claim represents a modest variation on the theme of its equal protection claim. According to the Basement, the city violated its substantive due process rights by intentionally singling it out for inspection and closure and by doing so on arbitrary grounds.

Generally speaking, "in order to establish liability for violations of substantive due process under § 1983, a plaintiff must prove that the governmental actor either intentionally injured the plaintiff or acted arbitrarily in the constitutional sense." *Upsher v. Grosse Pointe Public Sch. Sys.*, 285 F.3d 448, 453 (6th Cir. 2002). As our discussion of the clubs' equal protection analysis shows, however, the city had a legitimate and rational explanation for its inspection of the Basement— prior safety violations. But, the Basement replies, the fact that a board-up contractor was on hand during the inspection shows there was an intent to cause injury. Not so. The record shows that six

inspected businesses were closed, while four or five were not.  The city was performing a valid

inspection, and simply being prepared to take action on the findings of its inspection does not

establish a cognizable intent to injure.

III.

For these reasons, we affirm.