**Mark OLIN, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 07–728 C.**

United States Court of Federal Claims.

June 10, 2008.

---

Mark Olin, Garden Grove, CA, pro se.

Joseph Alan Pixley, Commercial Litigation Branch, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

MARGARET M. SWEENEY, Judge.

Presently before the court in the above-captioned case is defendant's motion to dismiss plaintiff's *pro se* complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").[1] Plaintiff alleges that the government violated a nondisclosure agreement relating to his theory explaining certain aircraft crashes. For the reasons set forth below, the court grants defendant's motion.

## I. BACKGROUND[2]

Plaintiff is an aerospace engineer. Compl. Ex. 8; Opp'n Ex. 12. After several aircraft crashes in the early 1990s,[3] plaintiff developed a theory to explain the crashes entitled the "Gyroscopic Rotation of Aircrafts." Compl. 1; *see also* Compl. Ex. 12–25 (describing the theory in detail). According to plaintiff, all of the crashes were precipitated by the aircraft experiencing an "uncommanded roll." Compl. 1. Based on this finding, plaintiff prepared instructions for pilots explaining how to stabilize an aircraft when it experienced an uncommanded roll. *Id.; see also* Compl. Ex. 26–27 (containing the pilot instructions). Plaintiff's pilot instructions were meant to help prevent future crashes. Compl. 1.

Plaintiff submitted his theory and pilot instructions to the National Transportation

---

1. Pro se complaints, " 'however inartfully pleaded' are held 'to less stringent standards than formal pleadings drafted by lawyers.' " *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (citing *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)).

2. The court derives the facts from plaintiff's complaint ("Compl."), the exhibits attached to the complaint ("Compl. Ex."), and the exhibits attached to plaintiff's opposition to defendant's motion to dismiss ("Opp'n Ex."). The exhibits attached to the complaint were not consecutively paginated. For citation purposes, the court assigned a consecutive number (from one to thirty-five) to each page following the five-page complaint.

3. These crashes include those of a USAir Boeing 737–300 on approach to Greater Pittsburgh International Airport on September 8, 1994; a United Airlines Boeing 737–200 in 1991 in Colorado Springs, Colorado; and an American Eagle Jetstream Super 31 on December 13, 1994. Compl. 1, 5; Compl. Ex. 1; Opp'n Ex. 2, 5–6.

Safety Board ("NTSB") in February 1995. *Id.;* Opp'n Ex. 2. Along with the theory and instructions, plaintiff submitted a nondisclosure agreement, which he signed and dated on February 10, 1995. Compl. 1; *see also* Compl. Ex. 6–8 (containing the nondisclosure agreement). In the nondisclosure agreement, plaintiff agreed to disclose the theory and instructions to the NTSB, so long as the NTSB agreed to the following conditions:

(1) that the disclosure of said document will be received and held in confidence by [the NTSB].

(2) that [the NTSB] will take such steps as may be reasonably necessary to prevent the disclosure of said document to others. . . .

(3) that [the NTSB] will not commercially utilize said document without first having obtained the written consent of [plaintiff] to such utilization.

(4) All materials transmitted from [plaintiff] to [the NTSB] and containing proprietary information relating to the "document" shall remain the property of [plaintiff] and shall be returned to [plaintiff] upon request.

(5) The transmission of the material containing such proprietary information relating to the "document" shall not be construed to grant [the NTSB] a license of any type under any patents, know-how, trademarks or copyrights owned by [plaintiff].

(6) If [the NTSB] decides to utilize said document, a reasonable fee mutually agreeable between the parties herein shall be negotiated no later than five (5) months after the signing of this Agreement by the parties thereto.

(7) If [the NTSB] decides not to utilize said document, [the NTSB] shall transmit to [plaintiff] in written form a brief reason, explaining why the document will not be utilized no later than five (5) months after the signing of this Agreement by the parties thereto.

Compl. Ex. 6–7. The chief of NTSB's Major Investigations Division—Ronald L. Schleede—signed the nondisclosure agreement on February 16, 1995, and returned the executed agreement to plaintiff. *Id.* at 7; Opp'n Ex. 2. In the letter accompanying the nondisclosure agreement, Mr. Schleede wrote:

We have carefully considered the nondisclosure agreement that you sent regarding your theory on the accident involving USAir flight 427. We agree that any theory that you provide will be held in confidence by the Safety Board. It may be necessary to address your theory with the parties to the Investigation, those being Boeing, USAir, Air Line Pilots Association, and FAA representatives. In the event that the Board finds it necessary to discuss your theory with the parties, they will be informed of the conditions of the non-disclosure agreement and will be advised to act in accordance with the agreement. While in the Safety Board's possession, all efforts will be taken to prevent inadvertent disclosure of your theory to any person not directly involved in the investigation.

It is possible that your theory contains information that is known or actively being pursued by the Safety Board in its investigation. Additionally, it is possible that your theory is based upon incomplete or inaccurate information and does not match the events that lead to the accident. In these cases, the Safety Board will return the documents to you and provide you with the basis as to our decision not to use your theory.

Compl. Ex. 8. Plaintiff avers that the "investigator from NTSB" told him that his theory was wrong because it was based on wrong information.[4] Compl. 1; Opp'n Ex. 2.

Plaintiff also submitted his theory to the Vice President of Flight Safety for Delta Airlines, David Gerardo. Compl. 2; Opp'n Ex. 3. Mr. Gerardo requested that plaintiff participate in a flight test to determine which aircraft were subject to gyroscopic rotation

---

4. This averment has no basis in Mr. Schleede's letter. *See* Compl. Ex. 8 ("[I]t is *possible* that your theory is based upon incomplete or inaccurate information. . . ." (emphasis added)). The court assumes that plaintiff either had a conversation with an NTSB investigator not specifically detailed in the complaint or is in possession of additional correspondence from the NTSB not attached to the complaint, which informs plaintiff of the NTSB's conclusion.

and at what speeds. Compl. 2; Opp'n Ex. 3. However, before a flight test could occur, Mr. Gerardo was "removed from his job." Compl. 2; Opp'n Ex. 3. Before he left his position, Mr. Gerardo informed plaintiff that he would discuss the theory with the new Vice President and with the Air Line Pilots Association. Compl. 2; Opp'n Ex. 3. Plaintiff asserts that the Air Line Pilots Association told him that his theory was wrong because it was based on wrong information. Compl. 2; Opp'n Ex. 3.

Plaintiff next submitted his theory to the Vice President of Flight Safety at another airline. Compl. 2; Opp'n Ex. 3. This Vice President informed plaintiff that he had received a copy of plaintiff's theory and pilot instructions from the Federal Aviation Administration ("FAA") and the "manufacturing company" (i.e., Boeing) in August 1995. Compl. 2, 5; Opp'n Ex. 3; see also id. at 2 ("NTSB, FAA and Boeing Co. made a [false] statement that Boeing Co. is the author of instructions to the pilot on how to stabilize the aircraft when the aircraft experiences 'Uncommanded Roll' from my theory 'Gyroscopic Rotation of Aircraft' and these instructions are only for [a] Boeing 737[ ].").

As he further alleges in the complaint, certain developments convinced plaintiff that the NTSB was in violation of the nondisclosure agreement. First, the NTSB's refusal to conduct a flight test indicated to plaintiff that the NTSB did not want to recognize his theory, because by recognizing his theory, the NTSB would be obligated to pay a reasonable fee for its use pursuant to the nondisclosure agreement. Compl. 2. Second, plaintiff inferred from Boeing's continued production of the 737 aircraft that Boeing

was using his theory, because without plaintiff's theory and pilot instructions, the 737 would be unsafe for flight. Id. at 2, 5. Third, descriptions of a pilot's efforts to avoid crashing an American Airlines Airbus A300 in New York on November 12, 2001, led plaintiff to the conclusion that the pilot had read his instructions for stabilizing aircraft experiencing an uncommanded roll. Id. at 2–3; Compl. Ex. 5; Opp'n Ex. 1, 3, 12, 15; see also Compl. 3 ("How [did] Airbus know[ ] about these instructions? I wanted to sell them these instructions. It shows that somebody is listen[ing to] my phone conversation[s]."). Fourth, plaintiff believed that the pilot's successful stabilization of an Eastwind Airlines Boeing 737–200 on approach to Richmond International Airport on June 9, 1996, resulted from the NTSB's disclosure of plaintiff's theory and pilot instructions. Compl. 3, 5; Compl. Ex. 3; Opp'n Ex. 3. Fifth, the FAA's December 23, 1996 publication of a "brochure" containing instructions on stabilizing Boeing 737s experiencing an uncommanded roll persuaded plaintiff that the NTSB had improperly disclosed his theory and pilot instructions.[5] Compl. 3, 5; see also Compl. Ex. 28–35 (containing the FAA's publication).

The FAA's "brochure" was actually a draft copy of an FAA final rule and request for comments issued on December 23, 1996.[6] See Compl. Ex. 28–35. The final rule:

> adopt[ed] a new airworthiness directive (AD) that is applicable to all Boeing Model 737 series airplanes. This action requires revising the FAA-approved Airplane Flight Manual (AFM) to include procedures that will enable the flight crew to take appropriate action to maintain control

5. Plaintiff further contends that by limiting the use of his misappropriated pilot instructions to Boeing 737s, the FAA, NTSB, and Boeing were complicit in the crashes of other aircraft experiencing uncommanded rolls, including a Comair EMB–120 Brasilia on January 9, 1997; John F. Kennedy Jr.'s aircraft on July 16, 1999; an Alaska Airlines MD–83 on January 31, 2000; and an MV–22 Osprey in April 2000. Opp'n Ex. 2; see also id. at 4–6 (containing a document entitled "Kennedy Crash Not Pilot Error"), 7 (containing a document entitled "Explanation of Crash of the MV–22 Tilt-Rotor Osprey on April 8, 2000"), 11 (containing plaintiff's letter to the President con-

cerning the crashes and urging the adoption of his pilot instructions).

6. In addition to the issuance date, the draft document submitted by plaintiff bore a date stamp from a facsimile machine of December 23, 1996. The rule was published in the Federal Register on January 2, 1997, and became effective on January 17, 1997. See 62 F.R. 15 (Jan. 2, 1997). It appears that the only difference between the draft document submitted by plaintiff and the final rule published in the Federal Register is that the draft document does not contain the effective date.

of the airplane during an uncommanded yaw or roll condition. . . .

*Id.* at 28. The new airworthiness directive included the following instructions:

UNCOMMANDED YAW OR ROLL RECALL

Maintain control of the airplane with all available flight controls. If roll is uncontrollable, immediately reduce angle of attack and increase airspeed. Do not attempt to maintain altitude until control is recovered. If engaged, disconnect autopilot and autothrottle.

*Id.* at 33.

Based on the foregoing evidence, plaintiff alleges that the NTSB violated the nondisclosure agreement by disclosing his theory and pilot instructions without paying him a reasonable fee. Compl. 3; Opp'n Ex. 3. Thus, in his October 15, 2007 complaint, plaintiff demands the following compensation: (1) "part of the cost of [the] Boeing 737–200" operated by Eastwind Airlines, which did not crash because the pilot used plaintiff's instructions;[7] (2) "part of the profit which Boeing Co. is making by selling [the] Boeing 737 after ... August, 1995," when Boeing received plaintiff's pilot instructions from the NTSB or the FAA;[8] and (3) compensation for the use of his pilot instructions. Compl. 3–4.

Defendant filed the instant motion to dismiss on December 21, 2007, contending that plaintiff's complaint is barred by the six-year limitations period found in 28 U.S.C. § 2501 (2000) and that plaintiff has failed to allege "the elements necessary to establish the existence of a contract between himself and the United States." Def.'s Mot. Dismiss ("Mot.") 1. Plaintiff filed an opposition to defendant's motion on January 28, 2008, and defendant filed a reply on March 12, 2008. The court deems oral argument unnecessary.

## II. DISCUSSION

### A. RCFC 12(b)(1) and RCFC 12(b)(6) Motion to Dismiss

In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor. *Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir.1995). With respect to RCFC 12(b)(1), plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction. *Land v. Dollar*, 330 U.S. 731, 735 & n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds*, 846 F.2d at 747. If the court finds that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

If the court finds that it possesses jurisdiction to entertain one or all of plaintiff's claims, it still must dismiss those claims that fail to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6). The Supreme Court recently clarified the degree of specificity with which a plaintiff must plead facts sufficient to survive such a motion in *Bell Atlantic Corp. v. Twombly*, —— U.S. ——, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), stating that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of

---

**7.** Plaintiff included price information for Boeing 737 aircraft from the Boeing website in an exhibit to his complaint. *See* Compl. Ex. 10. The price ranges from $50 million for a 737–600 aircraft to $85 million for a 737–900ER aircraft. *Id.* In an exhibit attached to his opposition to defendant's motion to dismiss, plaintiff clarified his request for compensation based on the price of a Boeing 737: "I require 30% of the cost of [a] Boeing 737. The cost of [a] Boeing 737 is 50 million dollars. Therefore 30% is 15 million dollars." Opp'n Ex. 1.

**8.** In an exhibit attached to his opposition to defendant's motion to dismiss, plaintiff clarified his request for compensation based on the profits realized by Boeing on its sale of Boeing 737 aircraft: "I require for each [sold] Boeing 737– 1% of the cost of [a] Boeing 737. 1% of the cost [of a] Boeing 737 ... is 500,000 dollars." Opp'n Ex. 1.

a cause of action will not do," *id.* at 1964–65 (citation omitted). The Supreme Court explained that although a complaint need not contain "detailed factual allegations," *id.* at 1964, the "factual allegations must be enough to raise a right to relief above the speculative level," *id.* at 1965. "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." [9] *Id.* at 1969. Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 814–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**B. Subject Matter Jurisdiction**

Whether the court has jurisdiction to decide the merits of a case is a threshold matter. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868). The parties or the court sua *sponte* may challenge the court's subject matter jurisdiction at any time. *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 506, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). The waiver of immunity "cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).

The Tucker Act, the principal statute governing the jurisdiction of this court, provides that the Court of Federal Claims has juris-

diction over claims against the United States that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States, and that do not sound in tort. 28 U.S.C. § 1491(a)(1) (2000). The Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States,* 27 F.3d 1545, 1554 (Fed.Cir.1994). Here, plaintiff contends that the substantive source of jurisdiction is the nondisclosure agreement signed by Mr. Schleede of the NTSB on February 16, 1995.

**C. Statute of Limitations**

Defendant first argues that this court lacks jurisdiction over plaintiff's complaint because it was filed beyond the applicable limitations period. Mot. 1, 4. Claims against the United States that are filed in the Court of Federal Claims must be "filed within six years after such claim first accrues." 28 U.S.C. § 2501. The Supreme Court recently held that 28 U.S.C. § 2501 provides an "absolute" limit on the ability of the Court of Federal Claims to reach the merits of a case. *John R. Sand & Gravel Co. v. United States,* — U.S. ——, —— – ——, 128 S.Ct. 750, 753–54, 169 L.Ed.2d 591 (2008). Further, the Supreme Court held that 28 U.S.C. § 2501 is not subject to equitable tolling. *See id.* at 756 (concluding that its "definitive earlier interpretation of the statute ... should offer a sufficient rebuttal" of any presumption in favor of equitable tolling).

In the instant case, plaintiff alleges that defendant breached the nondisclosure agreement on multiple occasions, including: (1) when NTSB refused to conduct a flight test; (2) when Boeing continued to produce

---

9. In so holding, the Supreme Court determined that the "no set of facts" language set forth in *Conley,* 355 U.S. at 45, 78 S.Ct. 99, "has earned

its retirement," *Bell Atl. Corp.,* 127 S.Ct. at 1969, 127 S.Ct. 1955.

**222**

the 737 aircraft after February 1995; (3) when the pilot of an American Airlines A300 allegedly used his pilot instructions on November 12, 2001; (4) when the pilot of an Eastwind Airlines Boeing 737–200 successfully stabilized his aircraft on June 9, 1996; and (5) when the FAA issued a rule on December 23, 1996, to be published in the Federal Register, containing instructions on stabilizing Boeing 737s experiencing an uncommanded roll. Although plaintiff did not specify with precision the dates on which some of the alleged breaches occurred, plaintiff clearly alleges a breach by the government on December 23, 1996, when the FAA issued a draft rule containing pilot instructions. Because the draft rule was published in the Federal Register on January 2, 1997, and became effective on January 17, 1997, the court concludes that plaintiff's claims against the government accrued no later than January 17, 1997.

Based on this accrual date, plaintiff was required by 28 U.S.C. § 2501 to file a complaint in this court by January 17, 2003. However, plaintiff did not file a complaint until October 15, 2007. Plaintiff argues that his delay in filing suit is excused by his inability to retain an attorney and the failure of all of the attorneys he contacted to inform him about the existence of the Court of Federal Claims.[10] Opp'n 1. In essence, plaintiff is seeking the tolling of the limitations period. However, such tolling is prohibited. *John R. Sand & Gravel Co.*, 128 S.Ct. at 756. In sum, because plaintiff filed a complaint in this court more than four years after the latest date on which his claims could accrue, plaintiff's complaint violates the applicable statute of limitations. Accordingly, the court must dismiss plaintiff's complaint. Because the court lacks jurisdiction over plaintiff's complaint, the court need not address defendant's alternate argument for dismissal.

### III. CONCLUSION

For the reasons set forth above, the court **GRANTS** defendant's motion to dismiss and

---

10. Plaintiff also alleges that the "NTSB ... forced the attorney not to take my case. This way the NTSB made the [statute] of limitation[s to be] exceed[ed]." Resp. Def.'s Mot. Dismiss ("Opp'n") 1. To the extent that plaintiff asserts tort claims against the government, those claims are beyond the scope of this court's jurisdiction.

**DISMISSES** plaintiff's complaint pursuant to RCFC 12(b)(1) for lack of jurisdiction. Plaintiff's application to proceed in *forma pauperis* is **GRANTED.** No costs.

**IT IS SO ORDERED.**

*See* 28 U.S.C. § 1491(a)(1) (excluding claims sounding in tort from the jurisdiction of the Court of Federal Claims); *see also Alves v. United States,* 133 F.3d 1454, 1459 (Fed.Cir.1998) ("To the extent that ... allegations sound in tort, the Court of Federal Claims lacks jurisdiction under the Tucker Act....").